UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FARM SANCTUARY; ANIMAL EQUALITY; ANIMAL LEGAL DEFENSE FUND; ANIMAL OUTLOOK; CENTER FOR BIOLOGICAL DIVERSITY; MERCY FOR ANIMALS, INC.; AND NORTH CAROLINA FARMED ANIMAL SAVE, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 19-cv-06910-EAW |
| v. | ) ) | **FIRST AMENDED COMPLAINT** |
| UNITED STATES DEPARTMENT OF AGRICULTURE; FOOD SAFETY AND INSPECTION SERVICE; AND CARMEN ROTTENBERG IN HER OFFICIAL CAPACITY AS FOOD SAFETY AND INSPECTION SERVICE ADMINISTRATOR | ) ) ) ) ) ) ) | Complaint Filed: December 18, 2019 *Hon.* Elizabeth Wolford |
| Defendants. | ) ) ) | |

## <u>FIRST AMENDED COMPLAINT FOR VACATUR, DECLARATORY, AND</u>

## <u>INJUNCTIVE RELIEF</u>

1.     Plaintiffs, seven nonprofit organizations dedicated to protecting the animals, people, and environments that suffer due to industrial animal agriculture and to ensuring that laws intended to protect against this suffering are faithfully implemented, bring this suit to challenge a final, nationwide regulation, 84 Fed. Reg. 52,300 (the Slaughter Rule), promulgated by Defendants that will allow nearly all of the pigs slaughtered in the United States to be slaughtered at unlimited speeds with very little federal oversight, posing serious risks to animal welfare, consumer health and safety, and the environment.

2.     Defendants have long faced criticisms, including from their own Office of Inspector General and the Government Accountability Office, for failing to appropriately enforce

humane slaughter and handling and food safety laws. Rather than addressing these serious and longstanding problems, the agency has exacerbated them by promulgating a regulation that will markedly reduce already-inadequate federal oversight at pig slaughterhouses while significantly increasing the number of animals slaughtered and the speed at which they are slaughtered.

3. The USDA's primary stated reasons for promulgating the Slaughter Rule were to help pig slaughterhouses increase their efficiency, improve their production methods, and adopt new technologies. 84 Fed. Reg. at 52,321. According to the agency's assumed production increases, the Slaughter Rule will result in roughly 11.5 million additional pigs slaughtered annually in the United States, and an $87.64 million surplus to the industry responsible for raising and slaughtering those pigs. *Id.* at 52,335.

4. For decades, USDA regulation has set a maximum line speed for pig slaughterhouses—an hourly cap on the number of animals that can be sent down the conveyor line to be stunned, shackled, hoisted, stabbed, bled out, scalded, and dismembered. Federal law mandates that these animals be inspected by federal inspectors at multiple points in the slaughter process, including upon arrival at the slaughterhouse and at the time of stunning and slaughter. The USDA determines line speeds based on the number of animals an inspector is able to inspect.

5. For many years, the USDA has allowed slaughterhouses to kill up to 1,106 pigs per hour. Voluminous documentation—much of it from the USDA itself—makes clear that even under this standard pig slaughterhouses frequently defy humane handling and food safety requirements, including by failing to properly render animals unconscious before they are shackled, have their throats slit, and are put into scalding tanks, and by routinely beating and electro-shocking pigs to keep them moving at a fast pace. Despite this evidence, the Slaughter

2

Rule removes this line speed limit—while also reducing the number of federal inspectors on the slaughter line.

6.      The Slaughter Rule further imperils animal welfare and human health by re-assigning critical inspection responsibilities to untrained slaughterhouse workers that by law are required to be conducted by USDA inspectors. Federal law requires Defendants to ensure the humane handling of pigs from the time their transport trucks approach the slaughterhouse gates until their death. To ensure humane handling, and to protect human health and safety, Congress requires USDA inspectors to examine and inspect each and every pig before the animal enters a slaughter establishment. The USDA has underscored that these agency inspections are the best way to detect potentially devastating diseases and to prevent widespread economic harm and disruption of the meat supply. Despite this recognition—and at the very same time that the agency is preparing to respond to the possibility of an outbreak of an African swine fever, which it recognizes as a devastating, deadly disease that would significantly impact the U.S. economy—the USDA, through the Slaughter Rule, has abdicated this statutory responsibility and re-assigned these inspection duties to the very slaughterhouses it is supposed to regulate.

7.      In promulgating the Slaughter Rule, the USDA failed to examine voluminous data demonstrating the many ways that animals, humans, and the environment will suffer as a result of its deregulatory move. Moreover, by requiring that untrained, overworked slaughterhouse employees, rather than federal inspectors, identify, sort, and remove live animals, the Slaughter Rule impermissibly delegates inspection responsibilities, in violation of the Humane Methods of Slaughter Act (HMSA), 7 U.S.C. §§ 1901-1907, Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601-695, and Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Additionally, the USDA failed to consider and disclose the significant environmental impacts that will result from

this regulation, in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370f.

8.      Accordingly, Plaintiffs seek an order declaring the Slaughter Rule unlawful and setting it aside.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because one or more of the Plaintiffs resides in this judicial district.

## PARTIES

### A.  Plaintiffs

### *Farm Sanctuary*

11.     Plaintiff Farm Sanctuary is a nonprofit, tax-exempt membership organization headquartered in Watkins Glen, New York, where it operates a 275-acre shelter that provides a home to more than 800 rescued farm animals and offers educational tours to the public.

12.     Farm Sanctuary aims to protect farm animals from cruelty and to inspire change in the way society views and treats farm animals through public education, animal rescue efforts, and advocacy.

13.     Since Farm Sanctuary was founded in 1986, it has rescued approximately 15,000 farm animals. Additionally, Farm Sanctuary receives more than 1,000 requests for assistance placing animals in need annually. The organization expends significant resources caring for farm animals at its own sanctuaries, as well as coordinating placement of and transporting animals to other sanctuaries and members of Farm Sanctuary's Farm Animal Adoption Network.

14.    Farm Sanctuary has more than 40,000 members and brings this action on its own behalf and on behalf of its members.

15.    By authorizing high-speed pig slaughter and reducing government oversight of pig handling at slaughterhouses, and increasing the number of pigs subjected to inhumane handling, the Slaughter Rule directly conflicts with, impairs, and frustrates Farm Sanctuary's mission.

16.    Farm Sanctuary has been forced to redirect its limited time and resources away from its existing farmed animal protection work to publicize and counteract the Slaughter Rule and the inhumane handling that would be prevented, or at least significantly reduced, but for the Slaughter Rule. Among other things, the Slaughter Rule forces Farm Sanctuary to redirect resources away from its core rescue, education, and advocacy work toward requesting information about incidents of inhumane handling and food safety risks at high-speed slaughterhouses; fighting to obtain that information; reviewing, analyzing, and digesting that information; and publicizing it to educate its members and the public in order to counteract inhumane handling and food safety violations.

17.    By significantly increasing the number of pigs raised for slaughter, the Slaughter Rule also forces Farm Sanctuary to divert additional resources to find placement, and provide transport and care for, increased numbers of pigs in need.

18.    Farm Sanctuary's members include consumers who eat pork products and are concerned about the increased health risks they face from consuming products from pigs who have not been adequately inspected under the Slaughter Rule.

19.    Farm Sanctuary also has members who live and work in communities adjacent to slaughterhouses that will take advantage of the Slaughter Rule's deregulatory provisions that are

challenged in this lawsuit. As a result of the Slaughter Rule's authorization of increased line speeds and reduced USDA oversight, these members will suffer harms to their health and aesthetic enjoyment of their communities, including from the noxious stench and fouled water from the pig slaughterhouses. These members, and Farm Sanctuary on its own and on their behalf, would actively seek out opportunities to voice these concerns, including by participating in any environmental review process.

20.     These injuries will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

### *Animal Equality*

21.     Plaintiff Animal Equality is a nonprofit, tax-exempt 501(c)(3) corporation that works internationally to end cruelty to farmed animals through corporate outreach, education, undercover investigations, and legal advocacy, including legislation and regulatory petitions.

22.     By authorizing high-speed pig slaughter and reducing government oversight of pig handling at slaughterhouses, and increasing the number of pigs subjected to inhumane handling, the Slaughter Rule directly conflicts with, impairs, and frustrates Animal Equality's mission.

23.     The Slaughter Rule requires Animal Equality to divert and redirect resources from its core activities toward investigating, educating the public about, and campaigning against high speed pig slaughter plants, including by raising awareness about the rule's impact on animals, and on seeking to overturn the rule through advocacy efforts.

24.     Specifically, the Slaughter Rule has forced and will continue to force Animal Equality to redirect its resources away from its core activities toward, among other things, educating and mobilizing its supporters to advocate for legislative measures to overturn the rule

6

or mitigate its effects; planning and conducting investigations of slaughterhouses that have taken advantage of the Slaughter Rule, in order to document the heightened risks of improper stunning and other inhumane handling at these establishments; and seeking, digesting, compiling, and disseminating public records documenting humane handling violations at high-speed pig slaughterhouses, in an effort to counteract their prevalence.

25.    Animal Equality's mission will no longer be frustrated and these diversions of substantial resources will no longer be necessary if the Slaughter Rule is declared unlawful, vacated, and set aside. As such, Animal Equality's injuries will be redressed if Plaintiffs prevail in this action.

### *Animal Legal Defense Fund*

26.    Plaintiff Animal Legal Defense Fund (ALDF) is a nonprofit, tax-exempt 501(c)(3) membership organization that works to protect the lives and advance the interests of animals through the legal system, including through litigation, providing free legal assistance and training to prosecutors, supporting animal protection legislation and opposing legislation that threatens animals' interests, and providing resources and opportunities to law students and professionals to advance the emerging field of animal law. ALDF has more than 200,000 members and supporters.

27.    The Slaughter Rule directly conflicts with, impairs, and frustrates ALDF's mission, and has required and continues to require it to divert and redirect resources from its core activities, including to mobilize its members and the public to oppose the rule, and to educate its members and the public about the negative animal welfare, environmental, and human health consequences of the Rule.

28.     ALDF also brings this action on behalf of its members and supporters, some of whom work in communities adjacent to slaughterhouses that are very likely to adopt the Slaughter Rule's deregulatory provisions, including its elimination of maximum line speed limits. These members and supporters fear that the noxious stench and fouled water from the pig slaughterhouses will become substantially worse and threaten their health and aesthetic enjoyment of their communities, should the slaughterhouses be permitted to increase the volume and speed of their operations while simultaneously curtailing inspector oversight.

29.     These members, and ALDF on its own and on their behalf, would actively seek out opportunities to voice these concerns, including by participating in any environmental review process.

30.     Other of ALDF's members regularly eat pork products and are concerned about the humane treatment and slaughter of the pigs raised and slaughtered for those products, and about the increased health risks they face from pork products from animals who have not been adequately inspected under the Slaughter Rule. These members will be unable to find pork products subject to sufficient humane and food safety standards because of the ubiquity of products coming from slaughter plants operating under the new rule.

31.     These injuries to ALDF and its members will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

### *Center for Biological Diversity*

32.     Plaintiff Center for Biological Diversity (Center) is a nonprofit, public interest environmental organization that works through science, law, and policy to secure a future for all species, great and small, hovering on the brink of extinction. For decades the Center has worked to protect imperiled plants and wildlife, open spaces, and air and water quality, as well as to

preserve the overall quality of life for people and animals. The Center has more than 1.6 million members and supporters.

33.     Central to the Center's mission is an understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. In support of its mission, the Center advances public programs and campaigns to combat the extensive risks to ecosystems, environmental health, sustainable food systems, and public health from industrial animal agriculture.

34.     The Center's campaign that focuses on industrial animal agriculture works to increase transparency around factory farms and slaughter operations, and to oppose the unjust and environmentally destructive practices that these facilities employ. To that end, the Center regularly submits comments and litigates over matters dealing with pollution and other public health and environmental harms from factory farms and slaughter operations.

35.     The Center and its members' species conservation and recovery interests are impaired because of the ongoing harm to imperiled species and their habitats as a result of habitat fragmentation, air and water pollution, and freshwater withdrawal practices by factory farms and slaughter operations, harm that is significantly exacerbated by the USDA's promulgation of the Slaughter Rule.

36.     Many of the Center's members and staff reside in, explore, and enjoy recreating in and around areas affected by the Slaughter Rule, and specifically around the thirty-five plants that the USDA has identified through this rulemaking very likely to enter this new program, lift line speeds, and reduce USDA oversight of slaughter operations. The Center's members and staff are concerned that their use and enjoyment of these areas will be impaired due to, among other

reasons, harm to the environment, harm to listed species, increased risk of exposure to harmful pollution, and increased suffering of animals because of the Slaughter Rule.

37.    The Center's members and staff are specifically concerned about the effects of increasing line speeds and decreasing governmental oversight in the thirty-five slaughter plants to animals, workers, the environment, and public health—concerns that are augmented because of the USDA's failure to adequately analyze these effects under NEPA or comply with its obligations under the HMSA and FMIA. Some of the Center's members and staff will suffer recreational, aesthetic, scientific, educational, conservation, and other environmental injuries, for example, due to the legal violations alleged in this Complaint, and in particular because of the USDA's finalization of the Slaughter Rule without first preparing an Environmental Impact Statement (EIS) or Environmental Assessment (EA) as NEPA requires, and making the NEPA review available for public review and comment.

38.    The Center and its members further have substantive, procedural, and informational interests in ensuring that the USDA complies with all applicable federal statutes and regulations in adopting final agency actions such as the one at issue before this Court. For example, if the USDA had prepared an EA or EIS under NEPA, the Center and its members and staff would have participated in the public process afforded for review of that environmental analysis under the statute.

39.    Some of the Center's members further include consumers who eat pork products and are concerned about the increased health risks they face because of the Slaughter Rule.

40.    These injuries are actual and concrete, are being presently suffered by the Center and its members and staff, and will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

10

*Animal Outlook*

41.     Plaintiff Animal Outlook (formerly Compassion Over Killing) is a nonprofit, tax-exempt 501(c)(3) organization whose mission is to change the world for animals. Animal Outlook works to challenge the status quo of animal agribusiness, expose the truth, deliver justice, revolutionize food systems, and empower others to stand up for animals by leaving them off of their plates.

42.     In furtherance of its mission, Animal Outlook advocates against government policies that encourage or allow cruelty to farmed animals, conducts public education on the realities of industrialized animal agriculture, coordinates public campaigns to encourage the adoption of vegan diets, and conducts undercover investigations to expose cruelty at industrialized factory farms.

43.     By authorizing high-speed pig slaughter and reducing government oversight of pig handling at slaughterhouses, and increasing the number of pigs subjected to inhumane handling, the Slaughter Rule directly conflicts with, impairs, and frustrates Animal Outlook's mission.

44.     The Slaughter Rule forces Animal Outlook to divert and redirect significant resources from its core activities toward educating and raising awareness among its supporters and the public about the Slaughter Rule and its impact on animals, including through numerous emails, blogs, petitions, and campaigns.

45.     If the Slaughter Rule is not vacated, Animal Outlook will be forced to continue to divert even more resources to investigate and document conditions at slaughterhouses that opt to take advantage of the Rule and lift line speeds and reduce USDA oversight of slaughter

operations, in order to publicize and counteract inhumane handling that would be significantly reduced but for the Slaughter Rule.

46.     As long as it is in effect, the Slaughter Rule will continue to frustrate Animal Outlook's mission and require it to divert resources. Because increased line speeds and reduced agency oversight are particularly detrimental to animal welfare, Animal Outlook will continue to divert and expend resources to oppose the Slaughter Rule and to educate the public about that decision and will investigate pig slaughterhouses operating at higher line speeds under the Slaughter Rule.

47.     But for the Slaughter Rule, Animal Outlook would not have to divert and expend these resources.

48.     These injuries will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

### *Mercy For Animals*

49.     Plaintiff Mercy For Animals, Inc. (MFA), is a nonprofit, tax-exempt 501(c)(3) corporation whose mission is to prevent cruelty to farmed animals and promote compassionate food choices and polices.

50.     MFA works to accomplish this mission through corporate and government engagement, movement capacity building, and conducting and releasing investigative exposés of industrialized animal agriculture.

51.     By authorizing high-speed slaughter of pigs and reduced government oversight of pig handling at slaughterhouses, and increasing the number of pigs subjected to inhumane handling, the Slaughter Rule directly conflicts with, impairs, and frustrates MFA's mission.

52.     The Slaughter Rule also requires MFA to divert and redirect its limited time and resources away from its core activities toward educating the public about and campaigning against the USDA's unlawful authorization of high speed pig slaughter plants, including by raising awareness about the Slaughter Rule's impact on animals and on seeking to overturn the rule through advocacy efforts. Among other things, MFA has diverted resources toward researching, drafting, and publishing materials that educate the public about animal welfare and other concerns implicated by high speed pig slaughter, and toward helping members of the public to urge their Members of Congress to support legislative measures to overturn or mitigate the Slaughter Rule. The Slaughter Rule forces MFA to divert resources from, among other things, its work challenging cruel but apparently lawful animal agricultural practices, including through legislative work.

53.     These injuries will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

### *North Carolina Farmed Animal Save*

54.     Plaintiff North Carolina Farmed Animal Save (NCSave) is a nonprofit, tax-exempt 501(c)(3) organization that advocates to end animal agriculture. NCSave's members bear witness to and document animals entering slaughterhouses, including pigs entering the Smithfield slaughterhouses in Tar Heel and Clinton, North Carolina, which the USDA has determined "will convert" and take advantage of the Slaughter Rule to eliminate line speed limits and reduce USDA oversight. NCSave's members regularly hold vigils at which they peacefully and lawfully gather outside slaughterhouses, including the Tar Heel and Clinton facilities, where trucks with animals in them stop.

13

55.     The Slaughter Rule's lifting of line speeds and reduction of USDA inspector oversight is likely to significantly increase the number of pigs entering these slaughterhouses during NCSave vigils, while also making it more likely that those animals will be sick, injured, and even dead, and will be handled in ways that violate the HMSA and FMIA. As a result, NCSave's members will suffer significantly increased aesthetic and emotional injuries.

56.     But for the Slaughter Rule's authorization of high-speed slaughter and reduced USDA oversight, NCSave's members would not suffer these increased aesthetic and emotional injuries.

57.     As a direct result of the Slaughter Rule, and the USDA's finalization of the rule without first preparing an EIS or EA as NEPA requires, and making the NEPA review available for public review and comment, NCSave's members will also face a substantially increased risk of exposure to a host environmental impacts, some of them health-threatening, at slaughterhouses, including exposure to increased air pollution, waste, and wastewater.

58.     These injuries will be redressed if Plaintiffs prevail in this action and the Slaughter Rule is set aside.

## B. Defendants

59.     Defendant USDA is the federal agency responsible for issuing the challenged Rule and for conducting inspections of slaughterhouses pursuant to the Humane Methods of Slaughter Act and the Federal Meat Inspection Act.

60.     Defendant Food Safety and Inspection Service (FSIS) is the agency of the USDA that has been delegated responsibility for implementing the HMSA and FMIA. *See* 9 C.F.R. §§ 300.1, 300.2.

61.     Defendant Carmen Rottenberg is the Administrator of the FSIS, to whom the USDA's functions under the HMSA and FMIA have been delegated. *See* 7 C.F.R. § 2.53(a)(2)(ii), (v).

## LEGAL FRAMEWORK

### A.  Humane Methods of Slaughter Act

62.     Based on a Congressional finding that "the use of humane methods in the slaughter of livestock prevents needless suffering" and also "benefits . . . consumers," the HMSA declares it "to be the policy of the United States that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901.

63.     The HMSA further provides that "[n]o method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane." *Id.* § 1902.

64.     Congress intended that the USDA interpret the phrase "handling in connection with slaughter" in the HMSA broadly, "to begin at the time livestock come into the custody of the slaughtering establishment, up to and including the moment of slaughter." S. Comm. Rep. No. 95-1059, at 4 (1978).

65.     Accordingly, the USDA has long recognized that, under the HMSA, it has responsibility to oversee and ensure the humane handling of all animals beginning at the time that "a vehicle carrying livestock enters, or is in line to enter, an official slaughter establishment's premises." Humane Handling and Slaughter of Livestock, FSIS Directive 6900.2 Rev. 2, at 6 (Aug. 15, 2011).

15

66.     The HMSA is incorporated by reference into the FMIA. 21 U.S.C. §§ 603(b), 610(b).

## B. Federal Meat Inspection Act

67.     The FMIA is a self-contained, comprehensive statutory inspection scheme that prohibits meat from covered species, including pigs, from entering interstate commerce unless both pre-slaughter (ante-mortem) and post-slaughter (post-mortem) inspections are conducted by federal inspectors in accordance with the requirements of the Act. 21 U.S.C. §§ 603, 604, 621.

68.     The purpose of the FMIA, as Congress made clear, is to protect "the public interest" and the "health and welfare of consumers" by "assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." *Id*. § 602.

69.     In furtherance of this purpose, the FMIA mandates that the Secretary of Agriculture "shall appoint . . . inspectors to make examination and inspection of all amenable species." *Id.* § 621.

70.     Specifically recognizing the importance of inspector independence, the FMIA makes it a felony for "[a]ny person, firm, or corporation, or any agent or employee of any person, firm, or corporation," to "give, pay, or offer, directly or indirectly, to any inspector, deputy inspector, chief inspector, or any other officer or employee of the United States authorized to perform any of the duties prescribed by [the FMIA and its regulations] any money or other thing of value, with intent to influence said inspector, deputy inspector, chief inspector, or other officer or employee of the United States in the discharge of any duty provided." *Id.* § 622. The FMIA likewise makes it a felony for any inspector to accept or receive any such thing of value. *Id.*

71.     The FMIA requires USDA inspection of animals both before they enter a slaughtering establishment and after slaughter to ensure that no part of any carcass determined to be "adulterated" passes into the human food supply. *Id*. §§ 603, 604.

72.     The FMIA expressly requires that the cost of these inspections "shall be borne by the United States." *Id*. § 695.

73.     In accordance with these statutory mandates, the USDA has promulgated detailed regulations governing the humane handling of animals from the moment their transport trucks approach the slaughterhouse gates through the moment they are slaughtered.

### *Humane Handling Requirements Under the FMIA*

74.     Federal regulations provide detailed, specific requirements that govern the unloading of animals from trucks into pens requiring, *inter alia*, that "[l]ivestock pens, driveways and ramps shall be maintained in good repair" and "free from sharp or protruding objects" that could "cause injury or pain to the animals." 9 C.F.R. § 313.1(a). In addition, "[l]oose boards, splintered or broken planking, and unnecessary openings where the head, feet, or legs of an animal may be injured shall be repaired"; "[f]loors of livestock pens, ramps, and driveways shall be constructed and maintained so as to provide good footing for livestock"; and "[l]ivestock pens and driveways shall be so arranged that sharp corners and direction reversal of driven animals are minimized." *Id.* § 313.1(a), (b), (d).

75.     Handling regulations further require that the slaughter process proceed at a natural, manageable pace. They mandate that: "Driving of livestock from the unloading ramps to the holding pens and from the holding pens to the stunning area shall be done with a minimum of excitement and discomfort to the animals. Livestock shall not be forced to move faster than a normal walking speed." *Id.* § 313.2(a).

17

76.   These regulations also provide:

> Electric prods, canvas slappers, or other implements employed to drive animals shall be used as little as possible in order to minimize excitement and injury. Any use of such implements which, in the opinion of the inspector, is excessive, is prohibited. Electrical prods attached to AC house current shall be reduced by a transformer to the lowest effective voltage not to exceed 50 volts AC.

*Id.* § 313.2(b).

77.   The handling regulations further prohibit the use of "[p]ipes, sharp or pointed objects, and other items" that "would cause injury or unnecessary pain to the animal" to drive animals. *Id.* § 313.2(c).

78.   In addition, specific requirements are set forth for disabled animals and other animals who are unable to move, including a requirement that they be separated from other animals and provided with a covered pen that protects them from climactic conditions, and a prohibition on dragging these animals while they are conscious. *Id.* § 313.2(d).

### *Ante-Mortem Inspection Under the FMIA*

79.   The ante-mortem provision of the FMIA expressly requires that USDA inspectors inspect *all* animals *upon arrival* at the slaughterhouse, *before* they are allowed to enter the slaughterhouse. The FMIA further requires that such agency inspection occur *before* animals are sorted in any way, and indeed requires that sorting be based on the findings of the agency inspections.

80.   Thus, the FMIA mandates that the Secretary of Agriculture "shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species *before they shall be allowed to enter* into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce . . . ." 21 U.S.C. § 603(a) (emphasis added).

18

81.     The FMIA further mandates that animals "found *on such inspection* to show symptoms of disease shall be set apart and slaughtered separately from all other cattle, sheep, swine, goats, horses, mules, or other equines . . . ." *Id.* (emphasis added).

82.     Pursuant to these statutory mandates, USDA's ante-mortem inspection regulations provide that "before the livestock shall be allowed to enter into any department of the establishment where they are to be slaughtered," they must "be examined and inspected" by a USDA inspector. 9 C.F.R. § 309.1.

83.     Pursuant to longstanding USDA policy, if any animal cannot be unloaded for ante-mortem inspection, the inspector will inspect that animal from outside the vehicle or enter the vehicle to inspect. FSIS Directive 6900.2 Rev. 2, at 6 (Aug. 15, 2011).

84.     Ante-mortem inspection requires inspectors to observe all livestock both at rest and in motion, including the overall condition of each animal, with particular attention to the animals' eyes and legs as well as his or her alertness, mobility, and breathing. In addition, ante-mortem inspectors are to look for abnormalities, such as unusual swellings.

85.     If an USDA inspector's ante-mortem inspection reveals an animal showing any signs of abnormality or disease, that animal must be set aside into a separate pen for further examination by a USDA veterinarian. 9 C.F.R. § 309.2.  The USDA inspector is responsible for ensuring that these animals are "provided with a covered pen sufficient . . . to protect them from the adverse climatic conditions of the locale." *Id.* § 313.1(c).

86.     Detailed regulations dictate the disposition of these animals, depending on their individual conditions as determined by a USDA inspector. *Id.* § 313.1; *see, e.g.*, *id.* § 309.5 (dictating disposition of pigs found by a USDA inspector to be affected by hog cholera); *id.* § 309.9 (dictating disposition of pigs "plainly showing on ante-mortem inspection that they are

19

affected with acute swine erysipelas"); *id.* § 309.15 (dictating disposition of pigs and other animals with vesicular diseases).

87.     When performing ante-mortem inspection, USDA inspectors are also required to verify compliance with humane handling regulations.

88.     The USDA has underscored that these front-line "inspections are often the best way to detect potentially devastating diseases that may be spreading through livestock populations," and that agency "veterinarians can in turn alert other officials who can act to prevent widespread economic harm and disruption of the meat supply." Brief of United States as Amicus Curiae Supporting Petitioner at 15, *Nat'l Meat Assn. v. Harris*, 565 U.S. 452 (2011) (No. 10–224), 2011 WL 3821398.

89.     The USDA has also stressed that precluding agency veterinarians from inspecting sick animals upon arrival would impede the recognition of serious diseases and the ability to contain outbreaks. *Id.* at 33.

90.     Ante-mortem inspection upon arrival at the slaughterhouse has long been recognized by the USDA and experts as critical to protect against outbreaks of foreign animal diseases that pose devastating risks to animals, human health, and the U.S. economy.

91.     The USDA and experts underscore that the foreign animal disease risks are on the rise as food animal production intensifies and human and animal populations increase.

92.     In particular, the USDA is currently investing significant resources in preparing for the possibility of an outbreak of the highly contagious African swine fever, which the World Organisation for Animal Health anticipates could kill a quarter of the world's pig population and which the USDA describes as "a devastating, deadly disease that would have a significant impact on U.S. livestock producers, their communities and the economy if it were found here. There is

20

no treatment or vaccine available for this disease." USDA, African Swine Fever, https://www.aphis.usda.gov/aphis/ourfocus/animalhealth/animal-disease-information/swine-disease-information/african-swine-fever.

### *Slaughter Inspection Under the FMIA*

93.     Pigs who pass ante-mortem inspection are sent down a conveyor line for slaughter processes, generally involving stunning, suspension (typically being shackled by one leg and then hoisted), being stabbed with a knife and bled out, and then scalded and dismembered.

94.     In addition to requiring that USDA inspectors examine and inspect animals prior to entry into a slaughterhouse and ensure their humane handling throughout their time at the slaughterhouse, the FMIA requires that, "[f]or the purpose of preventing the inhumane slaughtering of livestock, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of the method by which amenable species are slaughtered and handled in connection with slaughter in the slaughtering establishments . . . ." 21 U.S.C. § 603(b).

95.     This requirement implements the HMSA's mandate "that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901.

96.     Accordingly, USDA regulations require USDA inspectors to ensure that approved stunning methods are "effectively applied to animals prior to their being shackled, hoisted, thrown, cast, or cut" to ensure that they are not conscious and have been rendered insensible to pain prior to slaughter. 9 C.F.R. § 313.2(f).

97.     Detailed regulations set forth specific requirements for each approved stunning method. *See, e.g.*, *id.* § 313.5 (requirements for stunning by carbon dioxide gas); *id.* § 313.15

21

(requirements for captive bolt stunners); *id.* § 313.16 (requirements for stunning by gunshot); *id.* § 313.30 (requirements for stunning by electric current).

98. USDA inspectors are required to ensure compliance with these requirements. 21 U.S.C. § 603(b).

99. USDA regulations set maximum slaughter line speeds, based on the number of animals per hour inspectors are able inspect. Federal regulations long imposed a maximum line speed limit of 1,106 pigs per hour. *See* 9 C.F.R. § 310.1.

## C. National Environmental Policy Act

100. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is to "encourage productive and enjoyable harmony between man and his environment" and to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321; *see also id.* § 4331(a) ("recognizing . . . the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and "declar[ing] that it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony").

101. Among the critical purposes of NEPA are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences." 40 C.F.R. § 1500.1(c). To this end, "[p]ublic scrutiny [is] essential to implementing NEPA." *Id.* § 1500.1(b).

22

102.    NEPA achieves these goals by requiring federal agencies to take a "hard look" at potential environmental consequences and environmentally enhancing alternatives "as part of the agency's process of deciding whether to pursue a particular agency action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 100 (1983); *see also* 42 U.S.C. § 4332(1) ("[T]he policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [NEPA].").

103.    Specifically, NEPA requires all agencies of the federal government—including the USDA—to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). That statement is known as an Environmental Impact Statement (EIS).

104.    The EIS must, among other things, adequately describe the "environmental impact of the proposed action" and disclose the environmental consequences of the proposed action and each of the alternatives to the proposed action. 42 U.S.C. § 4332(C); *see also* 40 C.F.R. §§ 1502.1 (The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."), 1502.14 (The alternatives "section is the heart of the environmental impact statement" and "should present the environmental impacts of the proposal and the alternatives in comparative form.").

105.    In conducting this analysis, the agency must consider three types of environmental effects: those that are direct, indirect, and cumulative. *Id*. § 1508.25(c). Direct effects "are caused by the action and occur at the same time and place." *Id*. § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still

23

reasonably foreseeable." *Id*. § 1508.8(b). A cumulative impact results from the incremental impact of the proposed action "when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." *Id*. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*.

106. Under NEPA, "effects" and "impacts" are synonymous terms that include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health." *Id*. § 1508.8; *see also id.* § 1508.14 ("When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.").

107. The agency's statements "shall be supported by evidence that the agency has made the necessary environmental analyses." *Id*. § 1502.1.

108. "Major federal action[s]" under NEPA include "actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly." *Id*. § 1508.18. Actions include "new or revised agency rules, regulations, plans, policies, or procedures" and typically fall under specific categories including "[a]doption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act." *Id.* § 1508.18(a), (b)(1).

109. Determining "significance" in the context of NEPA requires the agency to look at the effects of its actions as a whole, including in terms of their effects on "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id*. § 1508.27(a). It also requires the agency to consider the intensity of the impact by evaluating factors

24

enumerated at 40 C.F.R. § 1508.27(b). "Intensity" "refers to the severity of the impact." *Id.* § 1508.27(b). "[I]n evaluating intensity," the agency is required to consider, *inter alia*, "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act." *Id.* 1508.27(b)(2), (4), (5), (9).

110. The agency cannot avoid significance by dividing a proposed project into component parts. *Id.* § 1508.27(b)(7) ("Significance cannot be avoided by . . . breaking [the action] down into small component parts.").

111. Under certain circumstances, a federal agency may prepare an Environmental Assessment (EA) to evaluate whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include "sufficient evidence and analysis for determining whether to prepare" an EIS, and must determine if an EIS is necessary or, if not, issue a Finding of No Significant Impact (FONSI). *Id.* §§ 1508.9, 1501.4. The agency must involve the public in EA preparation to the extent practicable. *Id.* § 1501.4(b).

112. The only circumstances under which neither an EIS nor an EA need be prepared in connection with a major federal agency action is when the action is "categorically excluded" from NEPA review; a categorical exclusion (CE) may only be invoked for the "category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* § 1508.4; *accord id.* § 1500.4(p).

113.    An agency's review as to whether the use of a CE is appropriate "shall" include analysis as to whether "extraordinary circumstances" exist that would require an EA or EIS to be prepared. *Id*. § 1508.4. "[E]xtraordinary circumstances" are those circumstances "in which a normally excluded action may have a significant environmental effect." *Id.; see also* 7 C.F.R. § 1b.4(a) (categorically excluding certain USDA actions "unless . . . an action may have a significant environmental effect").

114.    NEPA requires that an agency incorporate its environmental analysis into the decision-making process. 40 C.F.R. §§ 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."), 1502.1 (the "primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government").

### D. Administrative Procedure Act

115.    The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.

116.    The APA defines "agency action" to "include[] the whole or a part of an agency rule," and in turn defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." *Id*. §§ 551(13), (4), 701(b)(2).

117.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id*. § 706(2)(A).

118. An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

119. Under the APA, a reviewing court must also "hold unlawful and set aside" any agency action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

120. Finally, under the APA, a reviewing court shall "hold unlawful and set aside" any agency action that was promulgated "without observance of procedure required by law." *Id*. § 706(2)(D).

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

### A. The USDA's "Waiver" Program

121. In 1997, as part of a pilot program, the USDA granted five pig slaughterhouses a "waiver" from regulatory mandates, authorizing them to operate without any maximum line speeds and with fewer agency inspectors. 62 Fed. Reg. 31,553 (June 10, 2017). That pilot program is known as the HACCP-Based Inspection Models Project, or "HIMP."[1]

---

[1] "HACCP" in this context refers to the Hazardous Analysis and Critical Control Point program, which is a USDA "system whereby meat and poultry establishments can identify and evaluate the food safety hazards that can affect the safety of their products, institute controls necessary to prevent those hazards from occurring or keeping them within acceptable limits, monitor the performance of controls, and maintain records routinely." 61 Fed. Reg. 38,806, 38,814 (July 25, 1996).

122.    The stated goals of this pilot program were to increase food safety and plant efficiency. *Id.* at 31,555. Neither humane handling nor environmental impacts were considered. *See generally* 62 Fed. Reg. 31,553 (not once mentioning either of these issues).

123.    Over the years, numerous Government Accountability Office (GAO) and USDA Office of Inspector General (OIG) audits have consistently raised serious concerns about HIMP. These concerns are in addition to longstanding and well-documented concerns about the USDA's implementation of the HMSA and FMIA more generally. *See, e.g.*, USDA OIG, Food Safety and Inspection Service Followup on the 2007 and 2008 Audit Initiatives at 23, Audit Report 24016-0001-23 (June 2017) ("FSIS lacks assurance that inspectors working at slaughter establishments are ensuring that animals are humanely treated . . . . [W]e estimate that FSIS inspectors at 198 establishments (19 percent) may not be ensuring that humane slaughter requirements are consistently enforced."); *id.* at 12-51 (finding that 30% of deficiencies identified in two prior audits persisted, including numerous deficiencies related to humane handling); USDA OIG, FSIS, Inspection and Enforcement Activities at Swine Slaughter Plants, Audit Report No. 24601-0001-41 (May 2013) (finding that the FSIS's "enforcement policies do not deter swine slaughter plants from becoming repeat violators of the" FMIA and, "[a]s a result, plants have repeatedly violated the same regulations with little or no consequence" and "FSIS could not ensure humane handling of swine," and summarizing five prior audits "related to FSIS enforcement of food safety and humane handling" that "identified continuing problems with FSIS' inspections and enforcement"); GAO, Humane Methods of Slaughter Act: Actions Are Needed to Strengthen Enforcement 12, 2, GAO-10-203 (Feb. 2010), https://www.gao.gov/new.items/d10203.pdf (finding that FSIS "inspectors have not taken consistent actions to enforce HMSA once they have identified a violation" and the "FSIS cannot ensure that it is preventing the abuse of

28

livestock at slaughter plants or that it is meeting its responsibility to fully enforce HMSA," and noting previous OIG reports "on weaknesses in FSIS's management of HMSA").

124.    A 2013 OIG audit found that the HIMP pilot program "has shown no measurable improvement to the inspection process." FSIS, Inspection and Enforcement Activities at Swine Slaughter Plants at 19, Audit Report No. 24601-0001-41 (May 2013), https://www.usda.gov/oig/webdocs/24601-0001-41.pdf. The audit concluded that the USDA failed to "adequately oversee the program" and that, as a result, it was impossible to determine whether it had increased food safety. *Id.* at 17. Alarmingly, the OIG found that plants in the pilot program "may have a higher potential for food safety risks." *Id.* The OIG found that three of the ten plants with the most food safety violations were part of the pilot program, and that the slaughterhouse with the single highest rate of violations—nearly fifty percent more than the plant with the second highest number—was in the pilot program. *Id.* The OIG noted that facilities such as this one "have less assurance of food safety than a traditional plant." *Id.* at 18.

125.    A 2015 undercover investigation conducted by plaintiff Animal Outlook in one of the five HIMP pilot slaughterhouses, a Quality Pork Processors (QPP) plant supplying pork to Hormel Foods, documented many instances of inhumane handling and slaughter inflicted as workers attempted to keep animals moving in pace with high-speed lines. These included conscious pigs being dragged; over-utilization of electric prods to drive animals, including shocks to their faces and other sensitive areas; routine beatings with paddles and gates; and forcefully driving pigs in a manner that caused them to climb on top of one another. Even downed pigs—animals too sick or injured to walk—were handled in this way, because, according to a supervisor, they "don't have time" to handle them more humanely. Some downed pigs were even dragged by a metal hook into their mouth while still conscious.

29

126. The undercover investigation also revealed numerous animals being improperly stunned, or stunned multiple times, in apparent violation of the HMSA. Animals who appeared to still be conscious after stunning were documented on the slaughter line, even after having their throats slit. Another supervisor acknowledged the frequency of pigs regaining sensibility after stunning, stating flippantly that "Sometimes they come back, like zombies." Moreover, several pigs showed signs of having entered the scalding tank while still alive, having ultimately died of scalding or asphyxia in the boiling water.

127. The investigation also revealed apparent food safety concerns resulting from deficient inspections and plant procedures. The plant appeared to lack any procedure to designate and separate animals who became non-ambulatory once they were in the livestock area and consequently, these "downer" animals were slaughtered alongside ambulatory pigs, despite well documented links between non-ambulatory animals and food safety risks. Animal Outlook also documented numerous carcasses riddled with growths, abscesses, and lumps, some of which contained green or yellow pus, along with carcasses visibly contaminated with fecal matter.

128. The USDA called the incidents documented in Animal Outlook's investigation "appalling and completely unacceptable," concluded that they were inconsistent with humane handling requirements, and stated that had they "been observed by FSIS inspectors, they would have resulted in immediate regulatory action against the plant." But the agency asserted that because the actions "occurred at times when USDA inspection personnel were not performing verifications," the USDA would not suspend the plant's operations.

129. USDA records also document additional humane handling violations at QPP after this investigation, including approximately ninety pigs left penned without access to water and ineffective stunning.

130.    USDA records further document humane handling violations at other slaughterhouses participating in the pilot program, including a shackled pig who was observed blinking and trying to right himself just 100 feet from the scalding tank and pigs slipping and falling onto concrete while being forced to move by a slaughterhouse worker; at least one of these animals was unable to get back up.

## B. Proposed Rule

131.    Despite the many problems documented with the pilot program, on February 1, 2018, the USDA published a proposed rule announcing its plans to "establish a new inspection system" for pig slaughterhouses that would effectively allow any slaughterhouse to join the HIMP program—that is, to opt out of line speed limits while reducing the number of federal inspectors and having slaughterhouse personnel take on inspection responsibilities historically performed by agency officials, including examining and sorting animals upon arrival at the slaughterhouse. 83 Fed. Reg. 4780 (Feb. 1, 2018).

132.    The USDA asserted that the Slaughter Rule was necessary because "the prescriptive nature of some FSIS regulations inhibits efficient production, and the adoption of improved production methods, and restricts their ability to adopt new technologies," and because "adherence to current regulations at large and high volume establishments that exclusively slaughter market hogs prevents FSIS from efficiently allocating resources, which inhibits food safety improvements and humane handling hazard prevention." *Id.* at 4800.

133.    In proposing the rule, the USDA stated that it had determined that "40 high volume establishments that exclusively slaughter market hogs" and that "account for 92 percent of total swine slaughter" were "expected to" take advantage of the proposed provisions allowing for high-speed slaughter and reduced agency oversight. *Id.* at 4801. This number included the

31

five slaughterhouses in the pilot program, which the agency stated "are expected to adopt" the proposed provisions, *id.* at 4802, and thirty-five additional specific slaughterhouses that the USDA determined "are expected to co[n]vert" "over five years," *id.* at 4812; *accord id.* 4814; *see also id.* at 4802 ("The Agency assumes" that these thirty-five slaughterhouses "will adopt" these portions of the rule.). In making this determination, the USDA underscored "the industry's continued interest in increasing the number of establishments" engaged in high-speed slaughter. *Id.* at 4802. Thus, according to the USDA, "40 establishments . . . are likely to adopt" high-speed slaughter and reduced agency oversight. *Id.* at 4802.  A spreadsheet created by the agency and relied on in this rulemaking identifies each of these forty plants, for each one either noting that it is already part of the pilot program or that it "will convert" under the Slaughter Rule. *See* Exhibit 1.

134.    The USDA received more than 83,000 comments on the proposed rule, the vast majority of them—eighty-seven percent—negative. Opposition came from a diverse range of organizations and individuals, including FSIS inspectors, current and former slaughterhouse workers, veterinarians, consumers, consumer advocacy organizations, public health organizations, animal protection organizations, labor unions, worker advocacy organizations, and individuals who live downstream from pig slaughterhouses.

135.    According to the USDA, only the benefiting "swine slaughter establishments, trade associations representing the pork industry, and a few private citizens supported the proposed rule." 84 Fed. Reg. at 52,311.

### *Humane Handling Issues with the Proposed Rule*

136.    Among other things, comments submitted to the USDA pointed out the inherent conflict of interest created by shifting ante-mortem inspection responsibilities, including

32

examining, sorting, and removing animals, from USDA inspectors to slaughterhouse personnel, who are disproportionately people of color and immigrants and who face well-documented pressure to increase production, including intimidation and threats. Indeed, testimony submitted to the USDA during the comment period documents concerns about termination in retaliation for reporting concerns.

137.    Comments also underscored that allowing slaughterhouse workers to examine, sort, separate, and remove animals would constitute an about-face from prior pronouncements by the agency, including those regarding the critical importance of having agency officials observe all animals upon arrival at slaughterhouses to avert potentially devastating disease outbreaks. A USDA inspector from a HIMP pilot plant unequivocally commented, in a sworn affidavit, "Sick pigs are routinely getting into the system."

138.    Comments accompanied by voluminous exhibits further detailed how allowing slaughter facility staff to pre-sort animals puts animals—especially, though not exclusively, downed animals—at significant risk of inhumane handling. For example, employees at one slaughterhouse were documented repeatedly leaving pigs to languish and die in pens, sometimes without access to water.

139.    Comments also pointed out, and documented, that increased line speeds are likely to increase inhumane handling by pressuring workers to move animals more quickly, increasing the use of excessive force, including frequent shocks with electric prods, which has been documented by multiple studies to cause injuries and to cause suffering and stress by prompting pigs to turn back, jump, slip, and/or fall.

140. Comments further detailed the connection between high line speeds and overcrowding of animals in pens leading to the kill area, as well as overcrowding into carbon dioxide gas chambers used for stunning.

141. Comments also underscored that increased line speeds were likely to shorten the length of the stunning process used to render animals unconscious prior to slaughter—making it more likely that they may regain consciousness—while simultaneously making it less likely that inspectors on the fast-moving line would detect animals who had regained consciousness. Most high-speed pig slaughter plants use carbon dioxide or electric stunning, and faster line speeds risk shortening the time animals are in the gas chamber and increasing the likelihood that electrodes are not properly placed, both of which could result in pigs being conscious when they are shackled, when their throats are cut, while they are bleeding out, or even when they are dropped into boiling tanks for scalding.

142. Documentation of many instances of inhumane handling arising from workers attempting to keep animals moving in pace with high-speed lines at HIMP-pilot participant QPP was submitted to the agency, including footage of conscious pigs being dragged; over-utilization of electric prods to drive animals, including shocks to their faces and other sensitive areas; and routine beatings.

143. Documentation of numerous instances of improper and/or multiple stunning of animals at QPP was also submitted, including of pigs who showed signs of having entered the scalding tank while still alive, having ultimately died of scalding or asphyxia in the boiling water

144. Comments also detailed how the USDA's own records corroborate the relationship between line speeds and inhumane handling, including multiple incidents in which pigs at a slaughterhouse in the HIMP pilot program were beaten with excessive force and

34

prodded to force them to move faster; pigs being so crowded into a carbon dioxide chamber that the door couldn't close properly and pigs began asphyxiating while frothing at the mouth, gasping for air, kicking, and thrashing; an incident in which a slaughterhouse worker tried to drive twice as many pigs into a carbon dioxide chamber than it could hold, beating them on the back to force them in while they screamed and piled on top of one another to escape the beatings; and many instances in which crowded pigs became trapped in gates or carbon dioxide chambers, screamed in pain and distress, and had to be euthanized.

145.    Comments likewise explained how the USDA's own records document numerous instances even under current line speeds in which pigs regain consciousness, incidents that are likely to increase under the Slaughter Rule. For example, a USDA inspector documented a pig who was still breathing after having been stuck and bled, and who was paddling and trying to right herself. Another shackled pig was observed vocalizing and blinking.

146.    In addition to all of this documentation, the commenters also submitted substantial scientific literature expounding on these concerns to the USDA.

147.    Commenters also proposed alternative ways in which the USDA could much more effectively address humane handling and food safety concerns, including by prohibiting the slaughter of downed pigs for human consumption and requiring their humane euthanasia.

### Environmental Issues with the Proposed Rule

148.    Comments further detailed the direct, indirect, and cumulative environmental consequences of the proposed rule.

149.    Specifically, comments noted the USDA's reliance on an expected 12.49 percent average *increase* of line speeds, and therefore production, by plants operating under the new inspection program. 83 Fed. Reg. at 4812; 84 Fed. Reg. at 52335. As the agency summarized in

the proposed rule (and then again in the final rule), "[t]his increase in line speed is synonymous with an increase in industrial efficiency." 83 Fed. Reg. at 4812; 84 Fed. Reg. at 52,335.

150.    In support of this reasoning, the USDA provided a detailed set of estimates regarding the surplus increases anticipated at large and small high-volume establishments as a result of the Slaughter Rule. 83 Fed. Reg. at 4813; 84 Fed. Reg. at 52335. Breaking those surplus increases down into numbers of animals, approximately 11.5 million more pigs will need to be slaughtered annually in the establishments the USDA has identified through this rulemaking as expected to enter this new program in order to achieve the profit margins the USDA relies on to sustain the purported benefits of the regulatory change, a number that remains consistent from the proposed rule to the final rule.

151.    As comments detail, a net increase in pig production and slaughter of approximately 11.5 million pigs annually—resulting from the USDA's anticipated 12.49% increase in line speeds—will cause significant environmental impacts at the slaughterhouse level, including through increased waste, wastewater, and carcass treatment and disposal needs; increased demands for plant energy, freshwater, and infrastructure and transportation; and increased air pollution.

152.    For instance, many of the plants identified by USDA as expected to take advantage of the changes allowed by the Slaughter Rule directly discharge waste and wastewater into streams and rivers, generally pursuant to a Clean Water Act permit. Wastewater from slaughter plants typically contains substances like blood, fat, urine, and feces, which can deplete oxygen levels in waterways as they decompose, resulting in uninhabitable zones for aquatic organisms and fish kills at high concentrations. Wastewater from these facilities also typically contains additional pollutants such as suspended solids, oil, and grease, which can alter turbidity

and water quality and negatively affect aquatic life, including endangered and threatened species. High levels of nitrogen, phosphorus, fecal bacteria, and pathogens are also commonly found in wastewater from slaughter plants.

153.    Slaughter plants also utilize a significant amount of freshwater resources, uses that can be expected to increase as the numbers of animals slaughtered at a plant increases. Indeed, as noted in comments, according to the U.S. Environmental Protection Agency (EPA),

> In meat processing, water is used primarily for carcass washing after . . . hair removal from hogs and again after evisceration, for cleaning, and sanitizing of equipment and facilities, and for cooling of mechanical equipment such as compressors and pumps. *A large quantity of water is used for scalding of hogs for hair removal before evisceration.*[2]

The EPA estimates that pig slaughter can require between 291 and 442 gallons of water per 1000 pounds of live weight slaughtered. *Id.* at Table 6-1. This translates to between approximately 82.2 and 124.8 gallons of water per pig.

154.    An increased number of pigs slaughtered will also lead to significant indirect and cumulative environmental impacts at the supply-level because it will fuel an increased market for large pig breeding and production facilities capable of providing the enormous number of animals necessary to meet this demand.

155.    Given sector trends and the corporate ownership of the plants that the USDA has identified as likely to move into the new program, these breeding and production facilities will likely be concentrated animal feeding operations (CAFOs). CAFOs are facilities that confine hundreds to thousands of pigs in a concentrated location for the purpose of raising the animals to

---

[2] EPA, Technical Development Document for the Final Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category 6.1.1, EPA-821-R-04-011 (2004),  https://www.epa.gov/sites/production/files/2015-11/documents/meat-poultry-products_tdd_2004_0.pdf.

be slaughtered to produce meat and meat products. These facilities increase risks to animal welfare, the environment, and public health.

156. For example, pig CAFOs commonly release foul odors and other air pollution, including ammonia, hydrogen sulfide, volatile organic compounds, particulate matter, and greenhouse gases such as methane and nitrous oxide. Air emissions can cause serious and life-threatening health problems, and even death. The health problems include respiratory illness, irritation to the eyes, nose, and throat, anxiety and depression, memory loss, and heart disease—effects that are amplified in vulnerable populations like children and the elderly.

157. In addition to these public health risks, as detailed in comments to the USDA, air pollution from CAFOs can cause ozone and haze, and can increase the risks of climate change, largely as a result of the industry's significant production of methane and nitrous oxide. Methane from pig CAFOs is largely produced through the anaerobic decomposition of organic matter in biological systems (i.e., the breakdown of wastes). Nitrous oxide is typically a product of a microbial process occurring in soils and fertilizer through decomposition of applied livestock manure and urine. Domestically, as CAFO numbers rose between 1990 and 2014, so did total greenhouse gas releases attributable to these operations.[3]

158. Among other significant environmental effects, studies additionally show that pig CAFOs can pollute surface and groundwater resources through, among other ways, direct discharge, runoff, and seepage of concentrated animal wastes. The most common pollutants of

---

[3] EPA, Inventory of US Greenhouse Gas Emissions and Sinks: 1990-2014, EPA 430-R-16-002 at 2-18 (2016), https://www.epa.gov/sites/production/files/2016-04/documents/us-ghg-inventory-2016-main-text.pdf ("The majority of the increase observed in [methane] resulted from swine and dairy cow manure, where emissions increased 44 and 118 percent, respectively, from 1990 to 2014.").

concern associated with discharged CAFO wastes include: nutrients, antibiotics and other pharmaceuticals, heavy metals, and pathogens.

159. As further detailed in comments to the USDA, in addition to environmental impairment, exposure to biological contaminants from pig CAFOs, including pathogens and fecal matter, can also present a significant risk to human and wildlife health. Food and waterborne diseases associated with exposure to industrial farm animal waste include *Campylobacter spp.*, *Salmonella spp.*, *Listeria monocytogenes*, *Escherichia coli (E. coli)*, *Cryptosporidium parvum*, and *Giardia lamblia*, many of which are rapidly transmissible and can cause abdominal discomfort, vomiting, or other acute gastrointestinal distress, and even death. Further, as it relates to antimicrobial and other pharmaceutical use, "[t]he dosing of livestock animals with . . . antimicrobial agents for growth promotion and prophylaxis may promote antimicrobial resistance in pathogens, increasing the severity of disease and limiting treatment options for sickened individuals."[4]

160. Studies further link the proliferation of pig CAFO facilities to reduced economic health, impairment to public health and safety and the rural quality of life, and harm to biodiversity and species health.

161. The risks that these operations pose to animals, human health, and the environment increase as the numbers and sizes of CAFO facilities increase in a specific geographic region.

162. For example, as comments illustratively detail:

---

[4] EPA, Detecting and Mitigating the Environmental Impacts of Fecal Pathogens Originating from Confined Animal Feeding Operations: Review, EPA/600/R-06/021, 1-3 (Sept. 2005), https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=NRMRL&dirEntryId=148645 (citations omitted).

In 1995 Seaboard Farms moved in to set up a giant pork slaughterhouse with more than $60 million in direct subsidies and tax breaks. To supply the plant, Seaboard set up hundreds of giant metal barns, each containing nearly 1,000 hogs. Texas County now raises more than a million hogs annually. Seaboard produces as much sewage as the city of Philadelphia, and it sits in open-air lagoons, some as large as 14 acres and as deep as 25 feet. Neighbors complain of intolerable stench, and everybody worries about water pollution.[5]

## C. **The Final Rule**

163.  Despite all of these serious and well-documented concerns, and despite broad and overwhelming opposition, on October, 1, 2019, the USDA finalized the Slaughter Rule largely as proposed, with only minor modifications. *See* 84 Fed. Reg. 52,300.

164.  According to the USDA, the first "key element" of the Slaughter Rule is "[r]equiring establishment personnel to sort and remove unfit animals before ante-mortem inspection by [USDA] inspectors." *Id.* Under this provision of the Slaughter Rule, "establishment employees" rather than specially appointed USDA inspectors and public health veterinarians "are responsible for identifying and removing market hogs that are not fit for slaughter." *Id.* at 52,311. The Slaughter Rule does not require establishment employees performing these inspection and sorting responsibilities to undergo any training. *Id.* at 52,313

165.  In adopting this change, the USDA did not explain why it was reversing its prior policies and statements. Nor did it respond to the conflicts-of-interest, humane handling, and other concerns raised and documented by numerous commenters.

166.  The Slaughter Rule also "revok[es] maximum line speeds and authoriz[es] establishments to determine their own line speeds" without regard to humane handling or

---

[5] Humane Society of the United States, Supplemental Comments to Slaughter Rule, Docket No. FSIS-2016-0017-82179 (quoting Jedidiah. Purdy, *The New Culture of Rural America*, The American Prospect (Nov. 30, 2002)).

slaughter, *id.* at 52,300, while simultaneously reducing the number of federal inspectors on the line from a maximum of seven to a maximum a three, *id.* at 52,314, 52,300—a reduction of nearly sixty percent.

167. In adopting this change, the USDA cursorily dismissed concerns about the humane handling implications of revoking line speeds that were detailed and extensively documented by numerous commenters. The agency did not examine the relevant data presented by commenters—even though much of the data came from the agency itself—let alone explain how that data could justify lifting line speed limits. As a result, the USDA's perfunctory and Orwellian explanation for its decision—that removing line speed limits and reducing inspector oversight will somehow enhance humane handling and food safety—is not only wholly unsupported, it runs counter to the evidence before the agency.

168. Despite these significant regulatory changes—and their significant anticipated effects on public health and the environment, both at the slaughterhouse and CAFO level—the USDA did not prepare an EIS or even an EA and FONSI prior to finalizing the Slaughter Rule. Instead, the agency perfunctorily declared that the rule change was "categorically excluded" from any NEPA review on the grounds that the USDA agency issuing this regulation, the Food Safety and Inspection Service (FSIS), has been categorically excluded *as an agency* through USDA regulations from having to perform a NEPA review for any action that it takes. *Id.* at 52,317 (invoking 7 C.F.R. § 1b.4).

169. The USDA further asserted that it "does not anticipate that its decision to revoke maximum line speeds for establishments that operate under [this new program] will have individual or cumulative effects on the environment" because "expected sales of pork products to consumers will determine the total number of hogs that an establishment slaughters, not the

41

maximum line speed under which it operates." *Id*. This is an adaptation from the assertion the USDA relied upon in the proposed rule, which was that the "anticipated change in sales" due to the Slaughter Rule was "small," and therefore, the change in the number of pigs slaughtered, and the environmental effects, would be "small." In neither case did the USDA acknowledge, let alone address, the fact that this explanation runs directly counter to the economic benefits analysis the agency itself relies on to support its final decision, as well as to the very purpose of the Slaughter Rule.

170.    The USDA thereby avoided preparing any comprehensive analysis of the environmental, including wildlife-related, and public health impacts of the Slaughter Rule. The agency also avoided any alternatives or mitigation to the rule adopted.

171.    In promulgating the Slaughter Rule the USDA reiterated its determination that forty high-volume slaughterhouses accounting for ninety-three percent (a slight increase from the ninety-two percent identified in the proposed rule) of total annual pig slaughter "will choose to participate" in high-speed slaughter with less oversight as authorized by the regulation, 84 Fed. Reg. at 52,322; *see also id.* at 52323 ("40 establishments . . . are likely to adopt" high-speed slaughter); 52,334 (in addition to the five slaughterhouses participating in the pilot program, there are "35 establishments expected to convert . . . over 5 years"); Exhibit 1 (identifying each of the thirty-five plants that, according to the USDA "will convert" under the Slaughter Rule), and also reiterated "the industry's continued interest increasing the number of establishments participating" in high-speed pig slaughter, *id.* at 52,323.

172.    The final rule states that the USDA "will implement" high-speed, reduced inspection pig slaughter at all pig slaughterhouses that notify the agency of their intent to take advantage of the Slaughter Rule. *Id.* at 52,317.

42

173. But for the final rule, these forty slaughterhouses would not be able to lawfully engage in high-speed slaughter or to reduce USDA oversight.

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Violation of the FMIA, HMSA, and APA—Ante-Mortem Inspection)

174. Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

175. The FMIA explicitly mandates that *USDA inspectors* examine and inspect all animals before they enter any slaughtering establishment and that animals showing symptoms of disease be set apart *based on such inspections*. 21 U.S.C. § 603(a)

176. The FMIA and the HMSA requires that the USDA ensure the humane handling of animals beginning at the time they come into the custody of the slaughtering establishment. *Id.* § 603(a), (b); 7 U.S.C. § 1901.

177. Voluminous evidence in the rulemaking docket establishes that turning over slaughterhouse inspection duties to slaughterhouse employees will result in serious conflicts of interest and substantially increase the risk of inhumane handling.

178. The USDA's failure to meaningfully consider voluminous record evidence that requiring that slaughterhouse employees—rather than USDA inspectors—identify, sort, and remove animals puts animals at significant risk of increased inhumane handling, and the agency's failure to address obviously germane alternatives proposed by commenters, renders its decision arbitrary, capricious, and an abuse of discretion.

179. Likewise, the USDA's failure to explain its reversal from its own prior pronouncements regarding ante-mortem inspection renders its decision to require that

slaughterhouse employees—rather than USDA inspectors—identify, sort, and remove animals arbitrary, capricious, and an abuse of discretion.

180.    Because the requirement that slaughterhouse employees—rather than USDA inspectors—identify, sort, and remove animals is arbitrary, capricious, and an abuse of discretion, the Slaughter Rule should be held unlawful and set aside pursuant to 5 U.S.C. § 706 (2)(A).

181.    The Slaughter Rule's requirement that slaughterhouse employees, rather than USDA inspectors, identify, sort, and remove animals also exceeds the USDA's statutory jurisdiction and authority and should accordingly be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(C).

## SECOND CAUSE OF ACTION
### (Violation of the HMSA, FMIA, and APA—Revocation of Maximum Line Speeds)

182.    Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

183.    The HMSA, incorporated by reference into the FMIA, tasks the USDA with ensuring that animal "handling in connection with slaughtering" is humane, and that livestock, including pigs, are rendered unconscious and insensible throughout the slaughter process via a single shot or blow that is rapid and effective. 7 U.S.C § 1902; 21 U.S.C. §§ 603(b), 610(b).

184.    The USDA has long imposed a maximum line speed limit of 1106 pigs per hour on the basis that it is the maximum number of animals per hour inspectors are able inspect while conforming to the numerous detailed requirements of the FMIA and HMSA. *See* 9 C.F.R. § 310.1.

185. Voluminous evidence in the rulemaking docket documents why an increase in line speeds violates the FMIA and HMSA—and makes it impossible to ensure compliance with these laws—putting animals and food safety at serious risk.

186. The record before the USDA when finalizing the Slaughter Rule demonstrated that the Slaughter Rule's elimination of maximum line speeds will decrease HMSA compliance, a direct derogation of USDA's statutory mandate under the FMIA, both by increasing the risk that animals will not properly stunned and by increasing inhumane handling by workers trying to force animals to move quickly to keep up with fast line speeds.

187. The USDA's failure to examine the extensive relevant data before it regarding the relationship between increased line speeds and inhumane handling, and its failure to explain how revoking line speed limits could be justified in light of this evidence, renders the decision to revoke maximum line speeds arbitrary, capricious, and an abuse of discretion.

188. Because the USDA's revocation of maximum line speeds is arbitrary, capricious, and an abuse of discretion, it should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### (Violation of NEPA and the APA)

189. Plaintiffs incorporate by reference all preceding paragraphs as if those allegations were set out explicitly herein.

190. NEPA requires that, for all "major federal actions significantly affecting the quality of the human environment," the federal agency taking the action must prepare an EIS that, among other matters, analyzes the "impact of the proposed action." 42 U.S.C. § 4332(C). While USDA regulations grant FSIS a general categorical exclusion from "the preparation of an EA or EIS" under NEPA, actions that it takes—such as FSIS' action in promulgating the

45

Slaughter Rule—must continue to be evaluated for "significant environmental effect[s]." 40 § 1508.4; *see also* 7 C.F.R. § 1b.4(a); *id*. § 1b.3(c). If such effects exist, further NEPA analysis is required.

191.    The USDA has violated NEPA and NEPA's implementing regulations by finalizing the Slaughter Rule without first conducting the necessary analysis and by failing to take the requisite "hard look" at, and disclosing to the public, the adverse effects and potentially significant environmental impacts of the proposed action in an EA or EIS.

192.    The USDA asserts that a CE is appropriate in this instance because the promulgating agency is FSIS, and because the agency does not expect the Slaughter Rule will have "individual or cumulative" effects because the agency cannot predict fluctuations in the pork market. To the contrary, to reach its final decision on the Slaughter Rule, the USDA leans heavily on an economic benefits analysis that relies on the rule supporting an estimated 12.49 percent increase in production, which will lead to approximately 11.5 million more pigs slaughtered in these plants annually.

193.    As detailed in paragraphs 148-162, such an increase in pig demand and slaughter numbers will likely cause significant adverse environmental effects within the meaning of NEPA, including adverse impacts to public health and safety; significant direct, indirect, and cumulative environmental impacts—including impacts that are "highly uncertain or involve unique or unknown risks"; and potential adverse effects to species listed as threatened or endangered under the Endangered Species Act and their habitats. *See* 40 C.F.R. § 1508.27. Given the more than 83,000 comments the USDA received on the proposed rule, the effects of the Slaughter Rule on the quality of the human environment are further likely to be "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4).

46

194.    Thus, even if the Slaughter Rule could be covered by the general terms of a CE, "extraordinary circumstances" exist that require the preparation of an EIS or EA. The USDA's promulgation of the Slaughter Rule under a CE and its failure to prepare an EA or EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court issue an order:

1.    Declaring that the Slaughter Rule violates the HMSA and/or the FMIA and/or NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with law, and exceeds the USDA's statutory jurisdiction and authority in violation of the APA;

2.    Vacating and setting aside the Slaughter Rule;

3.    Enjoining Defendants from implementing or taking any action pursuant to the Slaughter Rule until the agency has complied with the APA, the HMSA, the FMIA, and NEPA;

4.    Awarding Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action; and

5.    Granting such other relief as the Court may deem just and proper.


Respectfully submitted,

Dated: February 18, 2020          /s/ Delcianna J. Winders

Delcianna J. Winders, *Supervising Attorney*
Cristina Kladis, *Student Attorney*
Animal Law Litigation Clinic
Lewis & Clark Law School
10015 S.W. Terwilliger Blvd., MSC 51
Portland, OR 97219
(503) 768-6858

dwinders@lclark.edu
cristinakladis@lclark.edu

Hannah M. M. Connor
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Sarah Hanneken, *Admitted pro hac vice*
Animal Equality
8581 Santa Monica Blvd. Ste. 350
Los Angeles, CA 90063
(414) 405-1970
sarahh@animalequality.org

Kelsey R. Eberly, *Admitted pro hac vice*
Cristina Stella, *Admitted pro hac vice*
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
keberly@aldf.org
cstella@aldf.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2020, I electronically filed the foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

/s/ Delcianna J. Winders

Delcianna J. Winders