# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| FARM SANCTUARY, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 6:19-cv-6910-EAW |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | ) | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

**TABLE OF CONTENTS**

Introduction..........................................................................................................................................1

Background............................................................................................................................................2

I.      Statutory Background ...............................................................................................................2

        A.      Federal Meat Inspection Act (the "FMIA") ...........................................................2

        B.      National Environmental Policy Act ("NEPA")......................................................3

II.     Regulatory Background ............................................................................................................3

        A.      The Traditional Inspection System ..........................................................................4

        B.      A New Approach to Food Safety at Meat and Poultry Establishments.........................5

        C.      Modernizing Swine Slaughter Inspection: The Proposed and Final Rules ...................8

III.    Procedural History .................................................................................................................10

Legal Standard ...................................................................................................................................11

Argument .............................................................................................................................................12

I.      Plaintiffs Have Not Shown That They Have Organizational Standing .......................................12

        A.      Plaintiffs Have Not Shown an Injury in Fact......................................................................13

        B.      Plaintiffs' Alleged Injury Is Self-Inflicted and Not Fairly Traceable to the
                Defendants' Conduct ..............................................................................................17

II.     Plaintiffs Have Not Shown That They Have Associational Standing..........................................17

        A.      Plaintiffs Have Not Shown That Any of Their Members Will Suffer an Injury
                in Fact........................................................................................................................18

                1.      Plaintiffs have not shown an injury in fact that is imminent based on
                        their members' alleged exposure to the increased risk of foodborne
                        illness.............................................................................................................18

                2.      Plaintiffs have not identified a member who has shown an injury in
                        fact based on environmental pollutants...................................................24

                3.      Plaintiffs have not identified a member who has shown an injury in
                        fact based on the Agency's alleged procedural violation of NEPA. ...............27

        B.      Plaintiffs' Alleged Injuries Depend on the Actions of Third Parties and Are
                Not Fairly Traceable to the Defendants' Actions..................................................28

Conclusion ...................................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman,*
    215 F.3d 7 (D.C. Cir. 2000) .................................................................................................7

*Am. Fed'n of Gov't Emps., AFL-CIO v. Veneman,*
    284 F.3d 125 (D.C. Cir. 2002) .............................................................................................7

*Am. Fed'n of Gov't Emps., AFL-CIO v. Vilsack,*
    672 F. App'x 36 (D.C. Cir. 2016) ......................................................................................20

*Balt. Gas v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ...............................................................................................................3

*Baur v. Veneman,*
    352 F.3d 625 (2d Cir. 2003) .........................................................................................*passim*

*Binno v. Am. Bar Ass'n,*
    826 F.3d 338 (6th Cir. 2016) .............................................................................................29

*Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.,*
    448 F.3d 138 (2d Cir. 2006) ..............................................................................................25

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) .........................................................................................13, 16

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ...........................................................................................................17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...............................................................................................17, 22, 27

*CREW v. Trump,*
    276 F. Supp. 3d 174 (S.D.N.Y. 2017),
    *vacated and remanded on other grounds,* 939 F.3d 131 (2d Cir. 2019) ....................................*passim*

*Ctr. for Food Safety v. Price,*
    No. 17-CV-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ...............................15, 16, 17

*Ctr. for Law & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) .........................................................................................15

*Envtl. Working Grp. v. FDA,*
    301 F. Supp. 3d 165 (D.D.C. 2018) ...................................................................................14

*Food & Water Watch, Inc. v. Vilsack,*
79 F. Supp. 3d 174 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) ........................................14

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) .................................................................................14, 20, 21

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ..............................................................................................................12

*Grocery Mfrs. Ass'n v. EPA,*
693 F.3d 169 (D.C. Cir. 2012) ............................................................................................30

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ..............................................................................................................15

*Irish Lesbian & Gay Org. v. Giuliani,*
143 F.3d 638 (2d Cir. 1998) ................................................................................................12

*Lane v. Holder,*
703 F.3d 668 (4th Cir. 2012) ..............................................................................................30

*Lee v. Bd. of Governors of the Fed. Reserve Sys.,*
118 F.3d 905 (2d Cir. 1997) ................................................................................................28

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ....................................................................................................12, 13, 29

*Makarova v. United States,*
201 F.3d 110 (2d Cir. 2000) ................................................................................................11

*McConnell v. FEC,*
540 U.S. 93 (2003) ................................................................................................................17

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,*
684 F.3d 286 (2d Cir. 2012) ................................................................................................12

*Nat'l Meat Ass'n v. Harris,*
565 U.S. 452 (2012) ............................................................................................................3, 4

*Nat'l Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) ............................................................................................15

*Nat. Res. Def. Council, Inc. v. FDA,*
710 F.3d 71 (2d Cir. 2013) ..............................................................................12, 18, 19, 24

*Nnebe v. Daus,*
644 F.3d 147 (2d Cir. 2011) ................................................................................................16

*Ragin v. Harry Macklowe Real Estate Co.*,
 6 F.3d 898 (2d Cir. 1993) ................................................................................................16

*Robinson v. Gov't of Malay.*,
 269 F.3d 133 (2d Cir. 2001) ..............................................................................................11

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*,
 713 F.3d 175 (4th Cir. 2013) .............................................................................................25

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ...........................................................................................................14

*Simon v. E. Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) .............................................................................................................29

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016) .............................................................................................12, 13, 28

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) .....................................................................................................25, 28

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
 517 U.S. 544 (1996) ...........................................................................................................25

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
 454 U.S. 464 (1982) .....................................................................................................13, 28

*Warth v. Seldin*,
 422 U.S. 490 (1975) ...........................................................................................................12

*Young Advocates for Fair Educ. v. Cuomo*,
 359 F. Supp. 3d 215 (E.D.N.Y. 2019) ........................................................................15, 17

**Statutes**

5 U.S.C. § 551 ..............................................................................................................................11

7 U.S.C. § 1902 ..............................................................................................................................3

21 U.S.C. § 602 ..............................................................................................................................2

42 U.S.C. § 4332(C) .......................................................................................................................3

42 U.S.C. §§ 4321–4370m-12 ........................................................................................................3

**Regulations**

7 C.F.R. § 1b.4(a) ...........................................................................................................................3

9 C.F.R. § 300.2(b)(1) .....................................................................................................................3

9 C.F.R. § 309 ..................................................................................................................4

9 C.F.R. § 310.1(b)(3) ....................................................................................................5

40 C.F.R. § 1501.3(a) ......................................................................................................3

40 C.F.R. § 1508.4...........................................................................................................3

40 C.F.R. § 1508.9(a) ......................................................................................................3

40 C.F.R. § 1508.18(a), (b)(1) .......................................................................................3

## **Other Authorities**

35 Fed. Reg. 15552 ..........................................................................................................4

50 Fed. Reg. 19900 ..........................................................................................................4

61 Fed. Reg. 38806 ..........................................................................................................5

62 Fed. Reg. 31553 ..........................................................................................................6

83 Fed. Reg. 4780....................................................................................................*passim*

84 Fed. Reg. 52300 ..................................................................................................*passim*

## Introduction

Plaintiffs are environmental and animal-welfare advocacy groups; they filed this case to challenge a Final Rule that sets out an optional new inspection system for swine slaughterhouses. Plaintiffs allege that the Rule harms them as organizations because it has forced them to use their resources to advocate against the Final Rule. They claim the Rule harms their members by exposing them to an increased risk of foodborne illness and environmental harms. While there is no doubt that Plaintiffs disagree with the Rule as a matter of policy, their alleged harms rest on a series of speculative possibilities. Thus, Plaintiffs do not have standing.

To begin, Plaintiffs' theory of organizational standing is boundless. They claim injury because, as part of their routine advocacy missions, they oppose the Rule on policy grounds. But Plaintiffs are all advocacy groups that exist to advocate. That they have prioritized the Rule as part of that advocacy in no way shows that the Rule has interfered with their organizational missions or normal activities.

Plaintiffs' claim of associational standing based on supposed harms to their members fares no better. Drawing from the Second Circuit's decision in *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003)—which analyzed a USDA-confirmed risk of exposure to a deadly and incurable disease—Plaintiffs allege their members will be harmed by an increased risk of exposure to foodborne illness. But unlike the allegations in *Baur*, Plaintiffs here fail to identify a disease as severe as the one at issue in *Baur*, and they fail to show that the alleged increase in risk of disease is more than speculative. Quite the opposite: rather than confirming that its inspection system could potentially expose consumers to a deadly disease, here, USDA concluded that the new system set out in the Rule will protect public health at least as well as the traditional system.

Plaintiffs also allege their members will suffer various environmental harms, but the complaint lacks specific allegations that allow this Court to evaluate whether any individual member is actually at risk of suffering these harms. Plus, these harms could happen only at establishments that actually

opt into the new inspection system, which is entirely optional, and that decide to increase production based on market demand. This speculative chain of potential events fails to establish associational standing.

Because the harms that Plaintiffs allege are speculative and based on the actions of third parties, and on events that may never happen, the Court should dismiss this case for lack of standing.

<u>Background</u>

I.      **Statutory Background**

      A.      **Federal Meat Inspection Act (the "FMIA")**

Congress found that it is in the public interest to protect consumers' health by "assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. Based on this finding, Congress enacted the FMIA. *See id.* To advance the goal of protecting consumer health and safety, Congress directed the U.S. Secretary of Agriculture to have USDA inspectors make "an examination and inspection of all amenable species before they shall be allowed to enter" any U.S. establishment that slaughters livestock for food products that are used in commerce. *Id.* § 603(a). Any animals showing symptoms of disease are set apart. *Id.* This is called ante-mortem inspection.

Also under the FMIA, federal inspectors must make "a post mortem examination and inspection of the carcasses and parts thereof of all amenable species" prepared at any U.S. establishment that slaughters livestock for human consumption. *Id.* § 604. As relevant here, any carcasses and parts that may be harmful to human health are removed and condemned so they do not enter the food supply. *Id.* §§ 601(m), 604.

Consistent with these provisions, the FMIA requires the Secretary to appoint inspectors to examine all livestock covered by the Act. *Id.* § 621. The inspectors likewise examine the "sanitary conditions" of all slaughter establishments that handle these livestock. *Id.* Congress directed the

2

Secretary to "make such rules and regulations as are necessary" to efficiently execute the FMIA. *Id.* These provisions apply to swine slaughter establishments. *See id.* § 601(j), (w). Finally, the FMIA incorporates the Humane Methods of Slaughter Act, *see id.* §§ 603(b), 610(b), which says that "[n]o method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane," *see* 7 U.S.C. § 1902.

## B. National Environmental Policy Act ("NEPA")

Under NEPA, 42 U.S.C. §§ 4321–4370m-12, federal agencies must examine the environmental effects of proposed actions and then inform the public of the environmental concerns that they considered when deciding to act. *See Balt. Gas v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). Under NEPA and its implementing regulations, federal agencies must prepare an Environmental Impact Statement for new or revised agency rules that "significantly affect[] the quality of the human environment." *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.18(a), (b)(1). In some cases, federal agencies must prepare an Environmental Assessment, 40 C.F.R. § 1501.3(a), which helps the agency determine whether an Environmental Impact Statement is necessary, *id.* § 1508.9(a).

While NEPA sets out the default rule, some actions and categories of actions are excluded from NEPA requirements; for those excluded actions, the agency must prepare an Environmental Assessment or an Environmental Impact Statement only when there are "extraordinary circumstances." 40 C.F.R. § 1508.4. USDA has found that the Agency, the Food Safety and Inspection Service, is "categorically excluded" from preparing an Environmental Assessment or an Environmental Impact Statement "unless the agency head determines that an action may have a significant environmental effect." *See* 7 C.F.R. § 1b.4(a), (b)(6).

## II. Regulatory Background

The Agency is responsible for implementing the FMIA and for carrying out USDA's mission of protecting consumer health and welfare. *See* 9 C.F.R. § 300.2(b)(1); *see also Nat'l Meat Ass'n v. Harris*,

3

565 U.S. 452, 456 (2012). To do so, the Agency has promulgated regulations that govern ante- and post-mortem inspections at swine slaughter establishments. *See, e.g.*, 9 C.F.R. pts. 309, 310; Swine Post-Mortem Inspection Procedures and Staffing Standards, 50 Fed. Reg. 19900 (May 13, 1985); Cattle & Swine Post-Mortem Inspection Procedures and Staffing Standards, 47 Fed. Reg. 33673, 33673 (Aug. 4, 1982); *see also* Revision Pursuant to Wholesome Meat Act, 35 Fed. Reg. 15552, 15563–66 (Oct. 3, 1970). These regulations have historically promoted the efficiency of USDA inspections and slaughterhouse operations. *See* 50 Fed. Reg. at 19901; 47 Fed. Reg. at 33673.

### A.   The Traditional Inspection System

Plaintiffs challenge a Final Rule that allows qualifying swine establishments to voluntarily replace the traditional inspection system with a new one. Under the traditional inspection system, the Agency's regulations require federal inspectors to conduct ante-mortem inspections of all livestock offered for slaughter. *See* 9 C.F.R. § 309.1; Modernization of Swine Slaughter Inspection, 83 Fed. Reg. 4780, 4783 (proposed Feb. 1, 2018) ("Proposed Rule"). As part of the inspection under the traditional system, inspectors must direct establishment employees to set apart animals showing visible signs of disease or other condemnable conditions. *See* 9 C.F.R. § 309.2; Proposed Rule, 83 Fed. Reg. at 4783. In practice, however, even under the traditional inspection system, most market hog slaughter establishments voluntarily segregate animals and set apart those showing visible signs before federal inspection. Proposed Rule, 83 Fed. Reg. at 4783. Establishments that currently do so must document their segregation procedures, and, after establishment personnel finish segregating, the federal inspectors inspect each animal offered for slaughter. *See id.* Federal inspectors also must observe the establishment's voluntary ante-mortem segregation procedures at least once per month. FSIS Directive 6100.1, § XI(B)(5) (July 24, 2014), https://www.fsis.usda.gov/wps/wcm/connect/2b 2e7adc-961e-4b1d-b593-7dc5a0263504/6100.1.pdf?MOD=AJPERES.

As for post-mortem inspection, under the traditional system, federal inspectors must inspect each hog in three separate parts: head, viscera, and carcass. 9 C.F.R. § 310.1(b)(3); Proposed Rule, 83 Fed. Reg. at 4783. Federal inspectors identify localized defects that are correctable through trimming, and they direct establishment employees to remove these defects. Proposed Rule, 83 Fed. Reg. at 4783. Federal inspectors also look for signs of disease or contamination by performing incisions and palpations, and they do "organoleptic inspections," which rely on sight, smell, and touch. *Id.* Under the traditional system's post-mortem inspection, establishment employees do no pre-inspection sorting, either to identify and remove correctable defects, or to flag carcasses or parts for a federal inspector's condemnation decision. *Id.* Thus, under the traditional inspection system, up to seven federal inspectors must be assigned per line, per shift, in large establishments. *Id.*

Because federal inspectors perform time-intensive post-mortem sorting activities under the traditional inspection system, the maximum post-mortem inspection rate for market hogs is 1,106 heads per hour when seven federal inspectors are on the inspection line; it is lower when there are fewer inspectors. 9 C.F.R. § 310.1(b)(3); *see also* Proposed Rule, 83 Fed. Reg. at 4784.

### B.      A New Approach to Food Safety at Meat and Poultry Establishments

In 1996, the Agency launched an initiative designed to target its resources to address the public health risks associated with foodborne pathogens that aren't detectable through traditional organoleptic inspection. *See* Proposed Rule, 83 Fed. Reg. at 4787; Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP) Systems, 61 Fed. Reg. 38806, 38807 (July 25, 1996). The Agency first published a final rule in 1996 that required establishments to develop a system of preventive controls designed to reduce pathogens and foodborne illnesses that pathogens cause. *See* 61 Fed. Reg. at 38806. The 1996 initiative marked a paradigm shift in the Agency's approach to fulfilling its statutory mandate; it put greater onus on establishments to ensure product safety and gave them flexibility to determine the best way to comply with the Agency's food safety program. *See id* at

38808; *see also* Proposed Rule, 83 Fed. Reg. at 4787. To align with the new philosophy and to fulfill its food safety mission, the Agency recognized that it must continue to adjust its approach to inspection and it must continue to clarify the division of responsibility. 61 Fed. Reg. at 38808.

The Agency adjusted its approach to slaughter inspection by developing the HACCP-Based Inspection Models Project (the "HIMP Pilot Project"). *See* HACCP-Based Meat and Poultry Inspection Concepts, 62 Fed. Reg. 31553 (June 10, 1997). The Agency used the HIMP Pilot Project to design and test new inspection models in volunteer swine and poultry slaughter establishments. *See id.* The Agency used it to correct something it saw as a "major problem": slaughter establishments were relying on Agency employees to sort acceptable products from unacceptable products and thus "ha[d] no mandate or incentive to remove carcasses and parts" before inspection. *Id.* at 31555. The Agency explained that, under the traditional inspection system, its resources were being used "inappropriately and inefficiently" to "take on the industry's responsibility for finding defects, identifying corrective actions, and solving production control problems." *Id.*

In turn, because the Agency was allocating its resources inefficiently, there was "[a] much more significant problem with" the traditional inspection system: it did not allow the Agency "to allocate resources according to public health risk." *Id.* Indeed, the traditional system was designed when animal diseases detectable by organoleptic inspection were more prevalent. *Id.* The Agency explained that this has changed because of significant advances in disease control and because livestock are being slaughtered at younger ages. *Id.* Thus, the systems in the HIMP Pilot Project were tested with the goals of (1) improving food safety, (2) increasing inspection effectiveness, (3) reducing the risk of foodborne illness, (4) promoting industry innovation, and (5) using the Agency's resources more efficiently. *See* Proposed Rule, 83 Fed. Reg. at 4787.

The HIMP Pilot Project was rolled out in five market hog slaughter establishments, and it involved changes to both the ante- and post-mortem inspection processes.[1] *Id.* at 4787–88. The HIMP ante-mortem process is similar to the voluntary segregation system that many market hog establishments are using already. *Id.* at 4787–88. That is, establishment employees sort animals before presenting them to federal inspectors, disposing of any animals that are deceased or suspected of having certain disorders. *Id.* at 4788. Then, federal inspectors examine all animals offered for slaughter after establishment sorting, and the inspectors direct establishment employees to remove any additional animals suspected of having certain diseases. *Id.* Federal veterinarians examine all animals removed (but not condemned) by establishment employees and by federal inspectors to determine whether those animals may be offered for slaughter. *Id.* Federal inspectors also observe establishment sorting procedures at least twice per shift. *Id.*

The HIMP Pilot Project's post-mortem inspection is similar to its ante-mortem inspection. Before presenting carcasses and parts for federal inspection, establishment employees sort them, trim correctible defects, and, if need be, mark them for disposal—all under federal inspector supervision. *Id.* Then, up to three federal inspectors visually inspect each hog's head, carcass, and viscera at fixed stations on the evisceration line. *Id.* Under this system, because most removable defects are corrected before reaching the federal inspectors, their evisceration line visual inspections are more efficient and effective. *Id.* This increased efficiency requires fewer inspectors than the traditional system, which, in turn, frees them up to conduct more offline inspections and humane handling verification tasks than they do under the traditional system. *Id.* These offline inspections include food-safety-related

---

[1] The Agency originally proposed a HIMP model that did not require federal inspectors to examine each carcass. *Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman*, 215 F.3d 7, 11 (D.C. Cir. 2000). The D.C. Circuit found this approach was inconsistent with the FMIA. *Id.* In response, the Agency modified HIMP, and the D.C. Circuit then held that the revised HIMP Project Pilot complied with the FMIA because it requires federal inspectors to examine each hog head, carcass, and viscera. *Am. Fed'n of Gov't Emps., AFL-CIO v. Veneman*, 284 F.3d 125, 130–31 (D.C. Cir. 2002).

verification activities. *Id.* As part of the HIMP Pilot Project, participating market hog slaughter establishments set their own evisceration line speeds—meaning they can exceed the existing maximum line speed—so long as federal inspectors verify the establishment's ability to maintain process control. *See id.* at 4796.

In 2014, the Agency analyzed comprehensive data from the HIMP Pilot Project participants from 2006 to 2013 and published a HIMP Report. *See id.* at 4788–89. There, the Agency compared the performance of the participants with comparable establishments operating under the traditional inspection system. *Id.* at 4789. Overall, the Agency found that federal inspectors performed more offline verification activities at the HIMP Project Pilot participants, and those participants had no more incidents of food-safety defects—and in some cases had fewer food-safety defects—than establishments operating under the traditional system. *Id.* at 4789–90. The Agency also published a peer-reviewed risk assessment; the data suggest that as federal inspectors increase certain offline procedures, the prevalence of *Salmonella* in market hog carcasses decreases. *Id.* at 4791.

**C.      Modernizing Swine Slaughter Inspection: The Proposed and Final Rules**

Based on the results of the HIMP Pilot Project, in early 2018, the Agency published a notice of proposed rulemaking. Proposed Rule, 83 Fed. Reg. at 4780. The Proposed Rule set out to amend the system for inspecting market hogs that are offered for slaughter by allowing qualifying establishments to adopt a new optional inspection system (the "New System"). Proposed Rule, 83 Fed. Reg. at 4780. The key elements of the New System include the three features tested during the HIMP Pilot Project: (1) it requires establishment employees to perform ante- and post-mortem sorting activities before federal inspection; (2) it shifts the Agency's resources from online inspectors to offline inspection activities, and it does so by reducing the number of online inspectors to a maximum of three per line, per shift; and (3) it revokes maximum line speeds and allows establishments to set their own speeds based on their ability to maintain process control. *Id.* at 4781.

Three parts of the Notice are worth highlighting. First, relying on the HIMP Report, the Agency explained that HIMP participants had no more incidents of food-safety defects, and in some cases fewer incidents, than establishments operating under the traditional system. *Id.* at 4789–90.

Second, the Agency noted that HIMP participants operated at an average line speed of 1,099 heads per hour—slower than the maximum speed allowed under the traditional inspection system— and line speeds varied from 885 heads per hour to 1,295 heads per hour.[2] *Id.* at 4796. The speeds varied because several factors affect line speeds. For example, equipment, animal size, herd condition, and employee numbers all affect an establishment's ability to increase line speeds. *Id.*

Third, the Agency addressed the Rule's anticipated environmental impact. *Id.* at 4819. The Agency explained that it expects establishments that adopt the New System to slaughter and process pigs more efficiently than they did under the traditional system. *Id.* The Agency noted that this could reduce production costs and possibly lower the price of pork products. *Id.* The lower price, in turn, could lead to a slight increase in demand for pork products, which could slightly increase the number of pigs slaughtered and condemned. *Id.* But because the Agency expects any anticipated change in sales to be very small, it likewise expects any change in the number of pigs slaughtered and condemned to be very small. *Id.* In turn, the amount of waste that establishments produce will likewise be very small. *See id.* The Agency thus concluded that the Proposed Rule will not have a significant individual or cumulative impact on the human environment. *Id.*

---

[2] Although the average line speed at the HIMP Pilot Project participants was slower than the maximum speed allowed under the traditional inspection system, it was roughly 12.49% faster than the line speed at comparable establishments operating under the traditional system. *See* Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52300, 52335 (Oct. 1, 2019) (codified at 9 C.F.R. pts. 301, 309, 310).

In 2019, the Agency published the Final Rule, effective December 2, 2019. Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52300 (Oct. 1, 2019) (codified at 9 C.F.R. pts. 301, 309, 310) ("Final Rule"). The Final Rule adopted the three key elements set out in the Proposed Rule.[3] *Id.*

Because the New System is optional, to assess the Rule's economic impacts, the Agency considered how many establishments might adopt. *See id.* at 52322. It predicted that, due to economic constraints, only certain market hog establishments will do so. *Id.* Forty of these establishments existed in 2016 (including the five HIMP Pilot Project participants). *Id.* But the Agency does not know whether any of them will ultimately opt in. *See id.* In fact, the Agency raised multiple potential adoption scenarios, including that only the five HIMP Pilot Project participants will adopt. *Id.* at 52339.

Finally, the Agency reached the same conclusion about environmental impact that it did in the Notice and thus did not prepare an Environmental Assessment or an Environmental Impact Statement. *Id.* at 52342–43.

## III. Procedural History

Plaintiffs are seven environmental and animal-welfare advocacy organizations. *See* First Am. Compl. ¶ 1, ECF No. 22. They advocate through public education, corporate outreach, legislation, lobbying, and litigation. *See, e.g.*, *id.* ¶¶ 12, 21, 26, 33, 41–42, 49–50. Some of the organizations have sued on their own behalf, and, as explained more below, they claim the Final Rule injured them by forcing them to divert resources to advocate against the Rule. *See id.* ¶¶ 16, 23, 27, 44, 52. Some of the organizations have sued on their members' behalf, claiming the Rule injured their members because it will expose them to an increased risk of foodborne illness, *see id.* ¶¶ 18, 30, 39, and because it will lead to establishments producing more pollution, *see id.* ¶¶ 19, 28, 36, 57. One organization says the

---

[3] The Final Rule also included two mandatory provisions that apply to all swine slaughter establishments: they must develop and implement sanitary dressing and microbiological sampling plans. *See id.* at 52322–33. Plaintiffs do not challenge these universal requirements.

Agency violated its members' procedural rights by not preparing an Environmental Assessment or an Environmental Impact Statement. *See id.* ¶ *38.* (And some organizations have sued on both their own behalf and their members' behalf. *See id.* ¶¶ 14, 27–28.)

Plaintiffs allege three causes of action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq. See* Compl. ¶¶ 174–94. First, they claim the Agency acted arbitrarily and capriciously, and abused its discretion, by requiring establishment employees to sort pigs before presenting them for federal inspection. *See id.* ¶¶ 178–79. They also say that the Agency violated its statutory jurisdiction and authority under the FMIA by allowing establishment employees, rather than federal inspectors, to "identify, sort, and remove animals." *See id.* ¶¶ 181, 175. Second, Plaintiffs claim that the Agency acted arbitrarily and capriciously, and abused its discretion, by revoking the maximum line speed limits for evisceration lines. *See id.* ¶ 187. Third, Plaintiffs claim that the Agency violated NEPA by finalizing the Rule without first preparing an Environmental Assessment or an Environmental Impact Statement. *See id.* ¶¶ 191–94.

**Legal Standard**

A district court may properly dismiss a complaint under Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Plaintiffs "ha[ve] the burden of proving by a preponderance of the evidence that [jurisdiction] exists," and a district court "may refer to evidence outside the pleadings" in resolving a Rule 12(b)(1) motion. *Id.*; *Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 n.6 (2d Cir. 2001) ("A district court 'may' consult evidence to decide a Rule 12(b)(1) motion in contrast with a Rule 12(b)(6) motion . . . where it may not. It 'must' do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction.").

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." To satisfy the case-or-controversy requirement, a plaintiff must show that it has

standing to sue, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), and it must do so for each claim, *see Nat. Res. Def. Council, Inc. v. FDA*, 710 F.3d 71, 80–84 (2d Cir. 2013), *as amended* (Mar. 21, 2013). As the parties invoking federal jurisdiction, Plaintiffs must allege facts that establish the three elements of standing. *Lujan*, 504 U.S. at 560. They must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

An organization must make one of two showings to establish standing. First, it "may have [organizational] standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. Second, an organization may have associational standing to sue on behalf of its members if some particular member of the organization would have had standing to bring the suit individually.[4] *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). In both cases, the organization must allege facts showing an injury in fact, that is fairly traceable to the defendant's conduct, that will likely be redressed by a favorable court decision. *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998).

<u>**Argument**</u>

I.  **Plaintiffs Have Not Shown That They Have Organizational Standing[5]**

---

[4] The organization must also show that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

[5] All of the Plaintiffs except North Carolina Farmed Animal Save are suing on their own behalf. *See* Compl. ¶ 14 (Farm Sanctuary); *id.* ¶ 24 (Animal Equity); *id.* ¶ 27 (Animal Legal Defense Fund); *id.* ¶ 40 (Center for Biological Diversity); *id.* ¶ 46 (Animal Outlook); *id.* ¶ 52 (Mercy for Animals).

Plaintiffs fail to show standing for two reasons. First, they have not shown that they have suffered an actual and particularized injury because issue advocacy groups use their resources to advocate in the ordinary course. And that's what Plaintiffs—issue advocacy groups—are doing here. Second, any alleged injury based on Plaintiffs' voluntary decision to advocate against the Final Rule is self-inflicted and thus not traceable to the Defendants' conduct.

## A. Plaintiffs Have Not Shown an Injury in Fact

As issue advocacy groups, Plaintiffs exist primarily to advocate. Although they must prioritize some issues over others, they are not actually injured in a particular way when they decide to advocate against one issue at the expense of another.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). The injury "must affect the plaintiff in a personal and individual way" and must be "real" and not "abstract." *Id.* (citation omitted). This requirement ensures that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). To show a concrete and particular injury, an organization suing on its own behalf must show "a 'perceptible impairment' of [its] activities." *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (citation omitted).

Generally speaking, Plaintiffs here are environmental and animal-welfare advocacy groups that have two missions: (1) "protecting the animals, people, and environments that suffer due to industrial animal agriculture" and (2) "ensuring that laws intended to protect against this suffering are faithfully implemented." *See* Compl. ¶ 1. They fulfill these missions primarily through advocacy, public

13

education, litigation, and corporate outreach. *See, e.g., id.* ¶¶ 12, 21, 26, 33, 41–42, 49–50. They allege

that the Final Rule "conflicts with, impairs, and frustrates" their missions. *See id.* ¶¶ 15, 22, 27, 43, 51.

As for injury, Plaintiffs claim the Rule "forced" them to use their resources to educate their

members and the public about the food-safety and inhumane-treatment issues that flow from the Final

Rule. *See id.* ¶¶ 16, 24, 45. And to educate, Plaintiffs say they have been "forced" to redirect their

limited time and resources away from their current advocacy efforts. *See, e.g., id.* ¶¶ 16, 24, 45. To sum

up, Plaintiffs are issue advocacy groups, and they say they have been injured by their own choice to

prioritize one advocacy issue (challenging this Rule) over others.

Plaintiffs have not alleged an actual injury because using their resources to advocate against

public policy is how advocacy groups spend their resources in the ordinary course. *See CREW v. Trump*,

276 F. Supp. 3d 174, 191–92 (S.D.N.Y. 2017) (noting "[i]t . . . stands to reason that spending resources

to investigate and challenge Defendant's [conduct] does not itself impose on [plaintiff] a concrete or

particularized injury" because that's how plaintiff operates in the ordinary course), *vacated and remanded*

*on other grounds*, 939 F.3d 131 (2d Cir. 2019). Indeed, challenging policies they disagree with, and raising

public awareness about those policies, are squarely within Plaintiffs' missions. *See* Compl. ¶¶ 12, 21,

26, 33–34, 42, 50. "[I]t is peculiar at best for an organization to contend that it has been injured because

it had to . . . devote resources to attack a . . . regulation when one of the organization's foundational

principles . . . is that it will devote time and resources toward engaging in such an attack." *Food &*

*Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 202 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).

Without an actual injury, Plaintiffs allege nothing more than an organizational interest in a

problem they think the Rule creates. And no matter how serious and strongly held that interest is, "a

mere 'interest in a problem'" is not an injury under Article III. *See Sierra Club v. Morton*, 405 U.S. 727,

739 (1972). To conclude otherwise would gut the standing requirement. *See, e.g., Envtl. Working Grp. v.*

*FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) ("But injuries to an organization's government lobbying

and issue advocacy programs cannot be used to manufacture standing, because that would allow lobbyists on either side of virtually any issue to take the Government to court.").[6]

Plaintiffs' expansive theory of organizational standing is inconsistent with both Supreme Court and Second Circuit precedent. The Supreme Court has held that an organization suffers an injury in fact when it is required "to devote significant resources to identify and counteract" a government policy that makes it more difficult for the organization to carry out its activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In *Havens*, the organizational plaintiff provided counseling and referral services to help individuals find housing; this was made more difficult by defendants' racial steering practices that directly interfered with this activity. *See id.* at 369–70. The Court held that the organization suffered an injury in fact because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* at 379.

Unlike the organization in *Havens*, Plaintiffs here have not alleged that the Rule burdens their ability to carry out any mission-related activities. Rather, they allege only that they diverted resources away from current activities to advocate against the Rule.[7] *See* Compl. ¶¶ 16, 23, 27, 44, 52. Other

---

[6] *See also Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 231 (E.D.N.Y. 2019) ("[I]f the Court were to accept [a standing argument identical to the one Plaintiffs make here], it would be difficult to conceive of a case in which an organization or individual would not have standing to challenge a statute that they find politically or socially disagreeable."); *CREW*, 276 F. Supp. 3d at 191 (explaining that, if the court accepted the plaintiff's standing argument, "it is difficult to see how any organization that claims it has directed resources to one project rather than another would not automatically have standing to sue"); *Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (same); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (no standing where "the only 'service' impaired is pure issue-advocacy"); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (no standing based on alleged injuries to organization's "educational and legislative initiatives").

[7] Plaintiff Farm Sanctuary alleges that the Rule—"[b]y significantly increasing the number of pigs raised for slaughter"—has "force[d]" it "to divert additional resources to find placement, and provide transport and care for, increased numbers of pigs in need." Compl. ¶ 17. This theory fails because it relies on the speculative assumption that the Rule will cause significantly more hogs to be slaughtered. *See* p. 26. Plaintiff Animal Defense Fund makes a passing reference to free legal services

advocacy groups have made nearly identical diversion-of-resources standing arguments, and district courts in this Circuit have rejected those arguments as inconsistent with *Havens. See CREW*, 276 F. Supp. 3d at 190 (rejecting advocacy group's diversion theory—and its reliance on *Havens*—because it "fail[ed] to allege either that Defendant's actions have impeded its ability to perform a particular mission-related activity, or that it was forced to expend resources to counteract and remedy the adverse consequences or harmful effects of Defendant's conduct"); *Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (holding that advocacy group "fail[ed] to plausibly allege 'diversion of resources' standing based on *Havens* and its progeny").

Consistent with *Havens*, Second Circuit precedent has also required organizations to allege that the challenged conduct burdens their ability to carry out their activities. In *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993), the Second Circuit addressed facts similar to those in *Havens*. 6 F.3d at 901. The court held that the organization had standing because it was forced to devote resources to identifying and counteracting the defendant's discriminatory conduct. *See id.* at 905. And this, the court held, prevented the organization from devoting more time and energy to its normal tasks: providing counseling and referral services. *See id.*; *see also Nnebe v. Daus*, 644 F.3d 147, 157–58 (2d Cir. 2011) (holding that organization had standing to challenge a city's suspension procedures because the organization spent resources counseling its members only after another party—the city— initiated proceedings against one of its members); *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 110–11 (holding that organization had standing to challenge an anti-solicitation ordinance). By contrast, Plaintiffs here—by publicly advocating against the Final Rule—are performing a normal task that's an everyday part of their missions.

---

that it provides, *id.* ¶ 26, but it does not plausibly allege that the Rule interferes with its ability to provide those services.

Thus, an organization may establish standing by alleging that the challenged Government conduct (1) raises the cost of providing services or (2) requires the organization to divert resources away from its normal activities to counteract adverse effects flowing from the challenged conduct. *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 232–33 (E.D.N.Y. 2019); *see also CREW*, 276 F. Supp. 3d at 190; *Ctr. for Food Safety*, 2018 WL 4356730, at *5. But an organization may not establish standing based on an advocacy organization's voluntary decision to prioritize one issue over another. *See Young Advocates*, 359 F. Supp. 3d at 233; *see id.* at 232 ("None of [the Second Circuit] cases support [the plaintiff's] theory of standing because the organizational plaintiffs in th[o]se cases did not engage in mere advocacy, but instead provided social services directly to the group harmed by the challenged government policy."); *CREW*, 276 F. Supp. 3d at 191–92; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

### B. Plaintiffs' Alleged Injury Is Self-Inflicted and Not Fairly Traceable to the Defendants' Conduct

Plaintiffs' alleged injury from their own value judgment about how to prioritize their resources also fails because it is self-inflicted. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).[8] In fact, another district court in this Circuit rejected an advocacy group's attempt—an attempt that is nearly identical to Plaintiffs' attempt here—to manufacture standing after concluding that any alleged injury was self-inflicted. *See CREW*, 276 F. Supp. 3d at 191. This Court should do the same.

### II. Plaintiffs Have Not Shown That They Have Associational Standing

---

[8] *See also McConnell v. FEC*, 540 U.S. 93, 228 (2003) (plaintiffs had no standing to challenge a statutory increase in political contribution limits because the inability to compete in fundraising arose from plaintiffs' "own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

Plaintiffs do not have associational standing because they have not shown an injury in fact under any of their three theories of harm (explained below). And even if they had, any injury would be caused by third-party establishments and thus is not fairly traceable to the Defendants' conduct.

## A. Plaintiffs Have Not Shown That Any of Their Members Will Suffer an Injury in Fact

Plaintiffs primarily rely on three theories of injury: (1) the New System will expose their members to an increased risk of foodborne illness, *see* Compl. ¶¶ 18, 30, 36; (2) the New System will lead to more pollution, and that pollution will harm the health or aesthetic enjoyment of Plaintiffs' members, *see id.* ¶¶ 57, 19, 28, 36; and (3) the Agency violated NEPA by promulgating the Final Rule without first preparing an Environmental Assessment or an Environmental Impact Statement, *see id.* ¶¶ 37, 38. All of these theories rely on speculative impacts that will flow from the Rule—unsupported by plausible factual allegations—and thus fail to establish standing.

### 1. Plaintiffs have not shown an injury in fact that is imminent based on their members' alleged exposure to the increased risk of foodborne illness.

Plaintiffs have not alleged a credible threat of harm based on exposure to an alleged enhanced risk of foodborne illness. The probability of harm that Plaintiffs must show varies with the severity of that harm. Here, Plaintiffs have not alleged that they will be exposed to a serious disease by consuming unwholesome pork products. So, they must show a greater probability of actually getting a foodborne illness, yet they fail to show that the New System will produce food-safety results that are worse than the traditional system.

In the Second Circuit, the framework for evaluating risk-based injury "[i]n the specific context of food . . . safety suits" is set out in *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003). *See* 352 F.3d at 634; *see also Nat. Res. Def. Council*, 710 F.3d at 80–84 (applying the *Baur* framework). Under *Baur*, Plaintiffs must allege a "credible threat of harm" "based on exposure to [the] enhanced risk" of foodborne

illness. *See* 352 F.3d at 637 (citation omitted). "[T]o satisfy that burden[,] [Plaintiffs] must allege that [they] face[] a direct risk of harm which rises above mere conjecture." *Id.* at 636. In determining whether a plaintiff has alleged a credible threat of harm, courts consider the probability of harm in the context of its severity. *See id.* at 637; *see also Nat. Res. Def. Council*, 710 F.3d at 81.

*Severity of harm.* Plaintiffs have not alleged that their members will be exposed to a severe disease by consuming swine products that have not been adequately inspected. In fact, they do not allege that their members will be exposed to any particular disease at all. Instead, Plaintiffs vaguely mention the "increased health risks they face from consuming products from pigs who have not been adequately inspected." Compl. ¶ 18; *see also id.* ¶ 39. But that bare assertion does not explain what those health risks are or how serious they might be. Plaintiffs do not even allege that contaminated swine products are more likely to be contaminated with a certain disease.[9]

Because Plaintiffs do not plausibly allege that they will be exposed to any certain disease, the credible-threat-of-harm analysis here is much different from the credible-threat-of-harm analysis in *Baur*. In *Baur*, the plaintiff sued USDA because it refused to "label all downed cattle as adulterated." *See* 352 F.3d at 628–30. The plaintiff alleged that downed cattle are more likely to be infected with mad cow disease. *Id.* at 627–28. Under USDA regulations, downed cattle could be used for human consumption so long as they passed a mandatory inspection. *Id.* at 628. The plaintiff alleged that inspectors might not detect the disease because it has a long incubation period and because the symptoms themselves were hard to identify. *See id.* at 629. Thus, the plaintiff claimed that USDA's

---

[9] Plaintiffs make two passing references to African swine fever, *see id.* ¶¶ 6, 92, but African swine fever "is not a threat to human health and cannot be transmitted from pigs to humans. It is not a food safety issue." *See* USDA Animal & Plant Health Inspection Serv., https://www.aphis.usda.gov /aphis/ourfocus/animalhealth/animal-disease-information/swine-disease-information/african-swi ne-fever (last updated Feb. 6, 2020).

refusal to label all downed cattle as adulterated and to ban their slaughter injured him because it exposed him to a risk of getting mad cow disease each time he ate beef. *See id.* at 630.

In *Baur*, the severity of mad cow disease drove the court's credible-threat-of-harm-analysis: "[plaintiff] alleges that downed cattle may transmit . . . a deadly disease with no known cure or treatment. Thus, *even a moderate increase* in the risk of disease may be sufficient to confer standing." *Id.* at 637 (emphasis added). Plaintiffs here, by contrast, do not allege that they will be exposed to a deadly disease when they consume pork that was not "adequately inspected." Because they do not allege exposure to a deadly disease, *Baur* requires that Plaintiffs show more than a moderate increase in the risk of foodborne illness.

*Probability of harm.* Plaintiffs have not adequately alleged an increase in the risk of foodborne illness. The D.C. Circuit recently rejected a standing argument nearly identical to the increased-risk-of-foodborne-illness theory that Plaintiffs rely on here, and the court did so when considering a challenge to a rule that's substantially similar to the Final Rule here. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915–18 (D.C. Cir. 2015). There, the plaintiffs alleged that shortcomings in the Agency's optional new poultry inspection system—including the reduced number of online federal inspectors and the resulting inspection line speeds—would increase the risk of foodborne illnesses. *Id.* at 915. The plaintiffs also pointed to purported flaws in the poultry HIMP Pilot Project studies. *Id.* But the court found that these allegations failed to show a substantial increase in the risk of foodborne illness, as compared to the traditional inspection system, and thus concluded that the plaintiffs had not satisfied the injury-in-fact requirement. *See id.* at 915–16; *accord Am. Fed'n of Gov't Emps., AFL-CIO v. Vilsack*, 672 F. App'x 36, 38 (D.C. Cir. 2016) (per curiam) (mem.) (unpublished). Plaintiffs' allegations here have the same defects as those at issue in *Food & Water Watch*, and this Court should likewise find that Plaintiffs have not shown an increased risk of foodborne illness.

Like the plaintiffs in *Food & Water Watch*, Plaintiffs here focus on discrete parts of the New System: the reduced number of online federal inspectors, line speed, and the alleged substituting establishment personnel for federal inspectors. *Compare* Compl. ¶¶ 5, 6, 136–45, *with Food & Water Watch*, 808 F.3d at 915–16. But, like the plaintiffs in *Food & Water Watch*, Plaintiffs here don't even mention the reallocation of resources for offline inspection. *Compare* Compl., *with Food & Water Watch*, 808 F.3d at 916 ("Plaintiffs' failure to account for the increase in offline inspections and their attendant impact on poultry production prevents us from inferring that the [new poultry inspection system] as a whole substantially increases the risk of foodborne illness."). In fact, Plaintiffs "make[] no allegation [about] the impact of increased offline verification inspectors on the presence of adulterated . . . [swine]." *See id.*

And like the plaintiffs in *Food & Water Watch*, Plaintiffs try to cast doubt on the results from the HIMP Pilot Project participants. *Compare* Compl. ¶¶ 124, 125, 127, *with Food & Water Watch*, 808 F.3d at 916. But, just like the plaintiffs in *Food & Water Watch*, Plaintiffs here "do not allege that these results are *worse* than what plants do under existing inspection systems." *See Food & Water Watch*, 808 F.3d at 916. Also like the plaintiffs in *Food & Water Watch*, Plaintiffs here point to statistics that support their theory while ignoring those that undermine it. *Food & Water Watch*, 808 F.3d at 917. As the Agency explained, the noncompliance rate at HIMP participants "was statistically significantly *lower* than that for the 21 comparison non-HIMP market hog establishments." *See* Final Rule, 84 Fed. Reg. at 52308 (emphasis added); *see also id.* at 52336.

Finally, Plaintiffs here, like the plaintiffs in *Food & Water Watch*, do not allege that the risk of adulterated swine "is higher under the [New System] as a whole than the existing inspection systems." *See Food & Water Watch*, 808 F.3d at 916–17. That is, isolated incidents of inhumane treatment do not support the inference that the New System—as a whole—will increase the risk of adulterated swine.

And this point highlights a critical difference between Plaintiffs here and the plaintiff in *Baur*. In *Baur*, the plaintiff alleged that the Agency could prevent the risk of mad cow disease by banning the slaughter of downed cattle—and by not doing so, the Agency increased that risk. *See* 352 F.3d at 627–28. Plaintiffs here, by contrast, do not argue that the New System exposes pork eaters to a new, avoidable food-safety risk. There is, of course, a risk of foodborne illness even under the traditional system. So, Plaintiffs must show that the New System increases the existing risk enough that it creates a credible threat of harm based on that increase. But Plaintiffs can only speculate as to whether the New System really will increase the risk. *Cf. Clapper*, 568 U.S. at 412–13 (holding that plaintiffs could only speculate as to whether the Government would use one statute, rather than another, to conduct surveillance).

On top of these pleading deficiencies, Plaintiffs' increased-risk-of-foodborne-illness theory ignores that "most market hog establishments under traditional inspection already voluntarily conduct sorting activities before [the Agency's] ante-mortem inspection." *See* Final Rule, 84 Fed. Reg. at 52311; Proposed Rule, 83 Fed. Reg. at 4783 (citing FSIS Directive 6100.1 (July 24, 2014), https://www. fsis.usda.gov/wps/wcm/connect/2b2e7adc-961e-4b1d-b5937dc5a0263504/6100.1.pdf?MOD=AJP ERESFSIS). Since most establishments already voluntarily sort the pigs before presenting them to federal inspectors, Plaintiffs' theory that the Final Rule will produce food-safety results that are worse than the results under the traditional system is not credible.

And even if Plaintiffs had plausibly alleged an increased risk in foodborne illness, their exposure to that risk is not imminent and instead depends on a speculative chain of hypotheticals. *See Baur*, 352 F.3d at 641 (explaining that the "exposure [to the disease] must be imminent"). First, because the New System is optional, establishments must adopt it. To be sure, for the purpose of cost-benefit analysis, the Agency determined the number of market hog establishments that are eligible to adopt the New System and, taking into account economic constraints, assumed that forty market hog

establishments would adopt. *See, e.g.*, Final Rule, 84 Fed. Reg. at 52301 (Table 1). But it also considered alternative scenarios, including that only the five HIMP Pilot Project participants—and no others—would opt into the New System. *Id.* at 52339. The Agency has no control over these private establishments' choices, and the Agency made clear that the provisions at issue "apply to only those establishments that choose to participate in the optional" New System. *Id.* at 52323.

Second, the establishments that choose to adopt must increase their line speeds above the current maximum. But the establishments may not do so. Indeed, establishments that participated in the HIMP Pilot Project operated at an average line speed of 1,099 head per hour, and line speeds among the participants varied from 885 to 1,295 head per hour.[10] Whether an establishment increases its line speed depends on several things, including internal constraints such as equipment, animal size, herd condition, and number of employees, *see* Proposed Rule, 83 Fed. Reg. at 4796, and external factors like consumer demand, *see* Final Rule, 84 Fed. Reg. at 52335, 52342–43. Thus, revoking maximum line speeds under the New System does not necessarily mean that establishments will increase their line speeds above the former upper limit. *See id.* at 52314, 52317.

And finally, to accept Plaintiffs' theory, increasing the line speed above the current maximum—coupled with the increased resources devoted to offline inspection—must actually do a poorer job of detecting food safety defects. Yet the Agency expects that the New System may lower the prevalence of *Salmonella*. Final Rule, 84 Fed. Reg. at 52332–33. This is consistent with the Agency's comprehensive analysis of data collected from HIMP participants; based on that data, the Agency concluded that HIMP participants "were performing as well as comparable large non-HIMP market

---

[10] Although the average line speed at HIMP Pilot Project participants was approximately 12.49% faster than at comparable establishments operating under the traditional system, Final Rule, 84 Fed. Reg. at 52335, it was still below the maximum line speed under the traditional system, *see id.* at 52314.

hog establishments" and explained that "redeployment of Agency resources to unscheduled offline activities was likely to contribute to improved food safety." Proposed Rule, 84 Fed. Reg. at 4788–89.

Given this chain of hypotheticals, Plaintiffs' claim is "less like a present injury and more like a *threatened* injury that is contingent and far-off rather than imminent." *See Nat. Res. Def. Council*, 710 F.3d at 86.

Because Plaintiffs' risk of harm depends on three hypothetical events, their theory is at odds with Second Circuit precedent. For example, in *Baur*, the exposure to mad cow disease was imminent because the plaintiff alleged that (1) downed cows were more likely to have mad cow disease, (2) inspectors might not detect the disease, and (3) USDA did not ban downed cows from the food supply. *See* 352 F.3d at 627–30. Thus, every day that USDA allowed downed cows into the food supply, the plaintiff was exposed to the risk of mad cow disease, and the Agency itself recognized that beef infected with the disease could possibly enter the food supply. *See id.* at 639. Here, by contrast, not only are Plaintiffs missing the "critical factor[]" of Agency confirmation, but the Agency believes that the New System could *improve* its ability to identify and protect consumers from deadly diseases. *See* Final Rule, 84 Fed. Reg. at 52301, 52310, 52336.

### 2. Plaintiffs have not identified a member who has shown an injury in fact based on environmental pollutants.

Plaintiffs have not shown an injury in fact from exposure to environmental pollutants for two reasons: (1) they have not meaningfully identified a member who would have standing in his or her own right and (2) the theory they use to explain how the New System will cause more pollution relies on an unsupported assumption and a speculative chain of events.

First, Plaintiffs' environmental-harm theory fails to clear even the first hurdle of the associational standing analysis: they have not meaningfully identified any individual member who will suffer this harm. The Supreme Court has explained that "plaintiff-organizations [must] make specific allegations establishing that at least *one identified member* ha[s] suffered or w[ill] suffer harm." *Summers v.*

24

*Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). Plaintiffs' theory of environmental injury assumes that slaughterhouses will give off some odor or discharge some waste. *See, e.g.*, Compl. ¶¶ 19, 28, 36. So, unlike their theory of exposure to foodborne illness, Plaintiffs' theory of environmental harm necessarily depends on their members' proximity to the slaughterhouses. Yet Plaintiffs allege only that some members "live and work in communities adjacent to slaughterhouses" that will adopt the New System, *see* Compl. ¶¶ 19, 28, and other members "reside in, explore, and enjoy recreating in and around areas affected" by the Rule, *id.* ¶ 36.

These allegations in no way "identify," *see Summers*, 555 U.S. at 498, the members who will suffer the harm. Even if Plaintiffs are not required to name names at this stage,[11] Plaintiffs must allege enough descriptive information that allows the Court to meaningfully analyze standing. Indeed, the Court must be able to assess whether Plaintiffs' alleged injury is concrete, actual, and particular to a certain member. *See, e.g.*, *Summers*, 555 U.S. at 493–94; *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). But without any information about how close Plaintiffs' members live to the slaughterhouses, it's impossible to assess (1) whether their alleged increased exposure to odor, gases, or waste is more than mere speculation or (2) whether these allegations amount to more than a generalized grievance.

---

[11] Although the Second Circuit has previously held that an association need not "name names" to properly allege an injury in fact to its members at the pleading stage, *see Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006), that holding is no longer correct after the Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). There, the Court explained that it has "dispensed with" the requirement "of naming the affected members" only "where *all* the members of the organization are affected by the challenged activity." 555 U.S. at 498–99. Thus, to the extent that *Downtown Development* held that an association need not name names—even when some and not all of its members are affected—that holding was abrogated by *Summers. See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (holding that *Summers* requires an association to identify a specific member—even at the pleading stage). Here, Plaintiffs do not allege that all of their members live, work, or recreate near slaughterhouses that will adopt the New System. Nor do they allege that all of their members consume pork. Plaintiffs thus have not identified a member for either theory of injury, and the Court should find that Plaintiffs lack associational standing on that ground alone.

Second, Plaintiffs' theory of environmental harm is speculative because it depends on an unsupported assumption and a chain of hypothetical events. Plaintiffs' entire theory of environmental harm assumes that the New System will cause an additional 11.5 million pigs to be slaughtered; in turn, that increase will lead to more waste that has a noticeable impact on the public. *See* Compl. ¶¶ 151–52. But that assumption is flatly speculative. Indeed, nowhere in the Final Rule did the Agency estimate the number of pigs that would be slaughtered, even if all thirty-five establishments ultimately adopt the New System. To be sure, the Agency predicted that the New System would increase efficiency and, in turn, that increased efficiency could lead to a surplus for those establishments that do adopt. *See* Final Rule, 84 Fed. Reg. at 52335. And in quantifying the total surplus, the Agency assumed that increased line speed would lead to increased production. *Id.* But the Agency made this assumption to illustrate—not predict—the potential benefits. And this assumption in no way predicted a 12.49% increase in *production*. It is not a given that every establishment that increases its line speed will automatically increase its production. In fact, an establishment could adopt the New System, increase its line speed, and by then satisfying market demand more quickly, reduce its hours of operation to meet the current demand. *See id.* at 52317.

As the Agency explicitly pointed out, production is dictated by expected sales, which turns on consumer demand. *Id.* In fact, establishments could increase production under the traditional system simply by increasing their hours of production. *See id.* Production is not dictated by line speed. *See id.* Nowhere in the Final Rule did the Agency predict how the New System will affect sales or consumer demand. The closest it came was noting that the New System's efficiencies could cause a "very small" decrease in the price of pork, and that tiny decrease could cause a "slight" increase in pork sales. *Id.* at 52342. And even if production does increase, it is still speculative whether that increase would increase environmental impacts. As the Agency pointed out, "all slaughter establishments, regardless of line speed, are required to meet all local, State, and Federal environmental requirements." *Id.* at 52317.

26

Plaintiffs' attempt to rely on environmental impacts that flow from concentrated animal feeding operations ("CAFOs"), *see, e.g.*, Compl. ¶¶ 155–162, is even more speculative. Plaintiffs do not allege that any of their members currently live near CAFOs. Rather, they rely on a speculative chain of hypothetical events to show how CAFOs will expose their members to environmental impacts at some unidentified point in the future: (1) the New System will increase the total number of pigs slaughtered, *see id.* ¶ 154; (2) in turn, this will "fuel an increased market for large pig breeding and production facilities capable of providing the enormous number of animals necessary to meet this demand," *id.*; and (3) the new facilities that will meet this need "will likely be" CAFOs based on "sector trends and the corporate ownership of the plants that the USDA has identified as likely" to opt into the New System, *see id.* ¶ 155. And finally, Plaintiffs allege that "[t]he risks that [CAFOs] pose to . . . human health[] and the environment increase as the numbers and sizes of CAFO facilities increase in a specific geographic region." *See id.* ¶ 161. This "highly attenuated chain of possibilities" it too speculative to show an injury. *See Clapper*, 568 U.S. at 410.[12]

### 3. Plaintiffs have not identified a member who has shown an injury in fact based on the Agency's alleged procedural violation of NEPA.

In large part, Plaintiffs' allegations about a NEPA-related injury are procedural in nature: they claim they would have participated in a NEPA process if offered. Compl. ¶ 38. But that alleged procedural harm, without more, is not an injury in fact under Article III.

When a plaintiff challenges an agency's failure to comply with a procedural requirement (like NEPA's environmental-analysis requirement), the plaintiff must do more than merely allege that the

---

[12] The *Baur* framework does not apply to Plaintiffs' theory of environmental injury because, by *Baur*'s own terms, it applies "[i]n the specific context of food and drug safety suits." 352 F.3d at 634. And with good reason. Unlike food and drug safety suits, where the same harm applies equally to the population that consumes the food or uses the drug, an environmental harm depends on a plaintiff's proximity to the pollutant. And even if *Baur* did apply, Plaintiffs have not shown a credible threat of harm based on exposure to the alleged enhanced risk of environmental harm for the reasons stated above.

agency should have prepared an Environmental Assessment or an Environmental Impact Statement to establish standing. This is because the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *see also Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 911 (2d Cir. 1997). That is, a plaintiff must still show an injury that meets Article III requirements. *See Lee*, 118 F.3d at 911; *Spokeo*, 136 S. Ct. at 1549 ("Article III standing requires a concrete injury even in the context of a statutory violation.").

Here, for many of the reasons explained above, Plaintiffs have not shown an imminent Article III injury based on the alleged NEPA violation because the alleged environmental harms are speculative. *See* pp. 26–27. The factual allegations do not support this speculative chain of events, and the Court should reject this speculative theory. *Baur*, 352 F.3d at 637 ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing.").[13]

### B. Plaintiffs' Alleged Injuries Depend on the Actions of Third Parties and Are Not Fairly Traceable to the Defendants' Actions

Even if Plaintiffs had alleged an injury in fact, they have not shown that those alleged injuries are fairly traceable to the Defendants' conduct.

---

[13] Plaintiff North Carolina Farmed Animal Save alleges that its members hold vigils at slaughterhouses where trucks carrying the pigs stop. Compl. ¶ 55. It claims that the Final Rule will make "it more likely" that pigs entering slaughterhouses are "sick, injured, and even dead." *Id.* Given that, North Carolina Farmed Animal Save says its members will suffer increased "emotional injuries" because of the Final Rule. *See* Compl. ¶¶ 55, 56. This theory fails because no factual allegations support its claim that more pigs will arrive sick, injured, or dead. Nor do any factual allegations support the claim that its members will somehow experience emotional harms that are distinct from the ones that they purportedly suffer under the traditional system. As the Supreme Court has repeatedly emphasized, emotional harms from "observ[ing] . . . conduct with which one disagrees" is not a basis for standing. *Valley Forge*, 454 U.S. at 485.

Where "the plaintiff is not himself the object of the government action or inaction he challenges," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citation omitted). This is because causation "hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction." *Id.* Thus, in such circumstances, an "essential element[] of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.* (citation omitted). It is a plaintiff's burden to show that the regulated third party has or will make choices in a manner that results in causation. *Id.*

For the harms Plaintiffs have alleged to occur, establishments must, at a minimum, voluntarily opt into the New System and voluntarily increase their line speeds above the current maximum.[14] The New Rule does not require either choice; it merely permits them. *See* Final Rule, 84 Fed. Reg. at 52300. Plaintiffs do not allege (because they cannot) that the establishments have adopted or will absolutely adopt the New System. They have alleged only that the establishments are eligible to do so and that the Agency expects them to do so. *See* Compl. ¶¶ 133, 171, 172. The same applies to increasing line speeds—Plaintiffs allege only that the establishments that adopt the New System are capable of increasing line speeds. *See id.* ¶¶ 10–12.

Courts have long held that third-party actions are not fairly traceable to a regulation where that regulation permits, but does not require, the third party to take the action that directly results in a plaintiff's injury. *See, e.g., Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) (holding that plaintiffs' injuries were not traceable to tax ruling that allegedly "encouraged" certain actions but did not require them); *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345 (6th Cir. 2016) (holding that plaintiff law student's injuries were not traceable to defendant bar organization where it permitted but did not

---

[14] For the environmental injury, these establishments must be the same ones that Plaintiffs' members live, work, or recreate near.

mandate law schools' use of allegedly discriminatory test); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012) (finding that plaintiff's alleged harms were not traceable to governmental actions where the approval of a new fuel "d[id] not force, require, or even encourage . . . introduc[tion] [of] the new fuel" but "simply permit[ted]" it); *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (holding that traceability was lacking where firearm regulation did not require middlemen to charge fees that caused plaintiffs' alleged injuries).

Here, every step in the chain—that establishments adopt the New System, that establishments increase their line speeds above the current maximum, and that the same establishments either do a poorer job of detecting unwholesome pork or produce more waste in areas near where Plaintiffs' members live, work, or recreate—depends on the independent choices of a third parties that are not before the Court.[15]

### **Conclusion**

For all these reasons, the Court should grant Defendants' motion and dismiss this case for lack of subject matter jurisdiction.

Dated: March 13, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director

*/s/ Bradley Craigmyle*
BRADLEY CRAIGMYLE (IL 6326760)
Trial Attorney
U.S. Department of Justice

---

[15] Likewise, Plaintiff North Carolina Farmed Animal Save's theory of emotional injury, *see* Compl. ¶¶ 55, 56, is not fairly traceable to the Defendants' conduct. For its theory to show injury, three things must happen: establishments must adopt the New System; those establishments must increase their line speeds above the current maximum; and those same establishments must treat animals inhumanely.

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 616-8101
Fax: (202) 616-8460
Email: bradley.t.craigmyle@usdoj.gov

PRERAK SHAH
Deputy Assistant Attorney General
Environment & Natural Resources Division

SEAN C. DUFFY (NY 4103131)
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
Ph: (202) 305-0445
Fax: (202) 305-0556
sean.c.duffy@usdoj.gov

*Counsel for Defendants*